*In re* M.M. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Sylvia M., Respondent-Appellant).

Second District    No. 2—02—0327

Opinion filed March 21, 2003.

Jay Wiegman, of Wiegman Law Office, of Somonauk, for appellant.

Meg Gorecki, State's Attorney, of St. Charles (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Kristine A. Karlin, of Mt. Prospect, for the People.

JUSTICE O'MALLEY delivered the opinion of the court:

Respondent, Sylvia M., the biological mother of E.S. and M.M., the minors involved in this case, appeals from an order of the circuit court of Kane County that (1) appointed the minors' foster parents as their guardians, (2) vacated an earlier order that appointed the Department of Children and Family Services (DCFS) as guardian of the minors, (3) terminated wardship, and (4) closed the juvenile case. Respondent argues that the trial court's decision was against the manifest weight of the evidence. The State responds that the trial court's order is not a final judgment and, therefore, we have no jurisdiction to hear this appeal. We hold that jurisdiction is proper, and we affirm.

We focus our attention on the facts that led to the trial court's determination that guardianship was in the best interests of the minors because it is that decision that is the subject of this appeal. The other facts are outlined briefly for context.

According to a report filed by DCFS, in October 1997 Elgin police officers, in the course of investigating a truancy, entered the apartment home of M.M.'s and E.S.'s paternal uncles. There the officers observed M.M. in a state of undress and without adult supervision or food. The police officers reported the apartment had a strong foul odor, the kitchen was filthy, and cockroaches were crawling on the walls and floors. The other minors present informed police that M.M.'s paternal grandmother, Iris M., was M.M.'s primary caretaker and that respondent would leave M.M. at their home for long periods of time.

On October 20, 1997, the trial court appointed Court-Appointed Special Advocates of Kane County (CASA) as guardian *ad litem* for the minors. Also on that date, the State filed a petition for adjudication, alleging that E.S. and M.M. were neglected and that M.M. was abused. Respondent stipulated to neglect, and the abuse count was withdrawn. On January 7, 1998, a dispositional order was entered naming M.M. and E.S. wards of the court. Pursuant to the order, M.M. was placed in the custody of DCFS, while E.S. remained in respondent's custody. On April 8, 1998, however, following an emergency motion by the State, the trial court held a hearing on E.S.'s custody. The court found that both respondent's and E.S.'s whereabouts were unknown and entered an order placing E.S. in the custody and guardianship of the State.

According to a report filed by CASA on May 27, 1998, respondent was living with friends in Palatine, Illinois, and had a job nearby. A report filed by DCFS on September 16, 1998, confirmed that respondent was living in Palatine and was earning $300 per week working at a Menards store.

According to a letter written by David Langenstrass, the supervisor for DCFS's Elgin office, M.M.'s and E.S.'s cases were sent to the northern region administrative office of DCFS from the Kane County office on February 25, 1999, for transfer to Cook County. The cases were finally transferred to the Cook County DCFS office on April 5, 1999.

Respondent testified that she lost her job at Menards in July 1999 because of accounting errors at the cash register she was operating. In August 1999 respondent lost her apartment in Palatine and, subsequently, moved in with her boyfriend in Rolling Meadows.

After a permanency hearing held on November 15, 1999, the court found that the tasks and services that respondent was to complete were not sufficiently delineated. Accordingly, the court ordered that

respondent complete parenting classes within 10 weeks, make visits on a regular basis with the children, continue to provide day care for the children, and demonstrate the ability to care for the minors in a safe and appropriate environment. At a permanency review hearing on February 28, 2000, the court found that respondent did not complete parenting classes within 10 weeks and missed a substantial number of visits with M.M. and E.S. Moreover, the court noted that instability in housing remained a problem, as respondent had moved again since the previous hearing on November 15. Respondent had, however, obtained employment as a teller at Harris Bank about one month before the hearing. At the conclusion of this hearing, the permanency goal was changed from "return home" to "termination of parental rights."

Sometime prior to May 31, 2000, DCFS worker Karen Austin was assigned to respondent's case. Although Austin stated that she had made a diligent search, she did not successfully make contact with respondent until a court hearing held on September 8, 2000. During the period before the court hearing, respondent was visiting her children regularly.

On October 24, 2000, the State filed an amended motion for the termination of parental rights as to E.S. and M.M. The State alleged in its motion that respondent was unfit as a parent because she failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2000)). Thereafter, a trial was conducted on the issue of respondent's fitness.

On February 20, 2001, at the conclusion of the trial, the court found that the State did not show by clear and convincing evidence that respondent failed to maintain a reasonable degree of interest. Accordingly, the court did not find respondent unfit. The court pointed out, however, that this did not necessarily change the permanency goal back to return home. Rather, the court directed DCFS to re-address the permanency goal in a new permanency report.

At a permanency review hearing held on May 18, 2001, the trial court found that DCFS had not presented the new permanency report to respondent in a timely manner. The court also noted that in the report tendered to the court DCFS had left the termination of parental rights and adoption as the permanency goal despite the fact that the court had not found respondent unfit. The court continued the hearing to May 24, 2001.

On May 18, 2001, DCFS submitted a report from a "parental capacity assessment" conducted by Martha Sutherland of Apex Assessments & Counseling, Ltd. Based on interviews and observation, the report concluded that E.S. and M.M. were bonded more to their

foster parents than to respondent and that separation from the foster parents would be "very traumatic" for the minors. Sutherland recommended that the foster parents "retain guardianship" of the minors and that respondent be allowed visitation. On May 24, 2001, DCFS filed a new permanency report in which it recommended a permanency goal of guardianship.

At a review hearing on May 24, 2001, the trial court found that respondent's failure to timely complete parenting classes, which contributed to the change in the permanency goal to adoption at the February 8, 2000, permanency hearing, was caused by the Cook County DCFS's referral of respondent to parenting classes that did not allow respondent to complete the classes by the court-prescribed deadline. The court believed that this mistake may have caused significant unnecessary delay.

The court found that a goal of return home could not be ruled out, but it noted that, because of the length of time the minors had been out of respondent's custody, the minors might not be able to make the transition necessary for a return home. Thus, the court set the permanency goal as return home within 12 months with concurrent planning for guardianship. The court also ordered DCFS to set up family therapy to assist in achieving the goal of return home.

Gloria Rodriguez, one of the therapists who met with the children, opined in a written report dated October 17, 2001, that guardianship was in the best interests of the minors. Rodriguez stated that it appeared that the minors were very attached to the foster parents but had no such attachment to respondent. When Rodriguez asked E.S. whether she minded visiting respondent, E.S. responded that she would rather not because she did not feel comfortable with respondent. Rodriguez also observed that E.S. appeared displeased when mention was made of respondent. Rodriguez believed that the uncertain situation was causing anxiety for the children and was detrimental to their self-esteem.

At a permanency review hearing held on November 19, 2001, Mary Leo, a family therapist who attempted to assist respondent in reunification with the minors, testified that she had met with the minors approximately six times. According to Leo, there was a bond between E.S. and her mother, but the bond between M.M. and her mother was so weak that Leo got the impression that M.M. was "wondering why she was coming to visit [respondent]." Leo also testified that the minors had stated to her that they did not want to return home but did want to continue to visit respondent. Leo stated that she believed that it was important for the children to have a permanent plan in place and that continued uncertainty was "devastating" for the children.

According to Leo, during the time the issue of returning home was being discussed, the minors became increasingly vocal about not wanting to return home. The children were uncooperative, and, in Leo's opinion, this indicated an "almost unwillingness" to work toward returning home. Leo also pointed out that the children had not had a long relationship with their mother. Leo stated that there would be "serious repercussions" if the minors lost their placement with the foster parents. Leo opined that the children should remain with the foster parents but that respondent should continue to have visitation because there was some bonding between respondent and the minors.

After viewing the evidence, the court noted:

> "There are two parts to return home. [Mother] followed through with the tasks and is [appropriate] with [the] children. [Mother] complied with critical parts of her [client service plan], but the children are not in any better position to make a return home than when [the] process started [and], if anything, have gone backward. [The] issue is how long do we drag this out—at what point do we say [the] children can't do this. While [there] are issues DCFS didn't follow thru on, none of these have affected [the] children's ability to attach [or] return to [their] mother. [The] therapist believes [that the] children will not be able to do this successfully. [The] best interest of the minors is the standard."

The court determined that it was not in the best interests of the minors to continue the effort at reunification because that effort was negatively affecting the minors and their relationship with their mother. For this reason, the court reset the permanency goal to guardianship.

On March 8, 2002, DCFS and CASA each filed a report recommending that the foster parents be appointed as guardians.

In a handwritten order following the hearing held on March 8, 2002, the court ordered guardianship, over respondent's objection. The order provided that, although the foster parents were to be appointed as guardians, respondent was still to have reasonable visitation with the minors. At the time of the order, visitation was to be one two-hour visit every month. However, visitation was to be readdressed by a mediator after three months in hopes of increasing visits to twice per month. The mediator was also to address the issues of communication between respondent and the foster parents and the minors' contact with respondent on special days such as birthdays.

Two typed orders file stamped March 8, 2002, each concerning one minor, immediately follow the handwritten order in the record. The orders terminate wardship, appoint the foster parents as guardians, and close the juvenile case. The orders also direct the clerk of the

court for Kane County to "file the closed juvenile case next to the open probate case for purposes of *all future motions* in Juvenile Court." (Emphasis in original.)

Respondent argues that the trial court committed manifest error when it awarded guardianship to the foster parents and closed the juvenile case.

Before we decide the merits of respondent's argument, we must address our jurisdiction to hear this appeal. The State asserts that this court lacks jurisdiction because the trial court's order is not a "final order" under Supreme Court Rule 301 (155 Ill. 2d R. 301). We disagree.

■ Supreme Court Rule 301 provides for appeal as a matter of right from "final judgments." "A final judgment is one that fixes absolutely and finally the rights of the parties in the lawsuit; it is final if it determines the litigation on the merits so that, if affirmed, the only thing remaining is to proceed with the execution of the judgment." *In re Adoption of Ginnell*, 316 Ill. App. 3d 789, 793 (2000). An order is not final where jurisdiction is retained for matters of substantial controversy. *Ginnell*, 316 Ill. App. 3d at 793. A final judgment disposes of or terminates the litigation or some definite part of it. *Ginnell*, 316 Ill. App. 3d at 793.

The State argues that the trial court order is modifiable for various reasons and, therefore, not a final judgment. To this end, the State's primary contentions are, first, that the trial court order is a permanency order; second, that guardianship orders such as the trial court order are always modifiable where parental rights have not been terminated; and, third, that, although guardianship orders are not modifiable after the close of juvenile proceedings, the trial court order was ineffective in closing the juvenile proceedings.

■ The State first contends that the trial court order is a permanency order and, thus, may not be appealed as a matter of right under the supreme court's recent ruling in *In re Curtis B.*, 203 Ill. 2d 53 (2002). In *Curtis B.* the supreme court decided that a permanency order may not be appealed as a matter of right under Supreme Court Rule 304(b)(1) (155 Ill. 2d R. 304(b)(1)). Section 2—28(3) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2—28(3) (West 2000)) provides that a permanency order is issued following a permanency hearing and sets forth the court's determination as to the future status of the child. The order is to contain a permanency goal for the child that is chosen based on the child's best interests from a list of enumerated goals that includes alternatives such as return home, adoption, and guardianship on a permanent basis. At subsequent permanency hearings, held at least every six months until the permanency goal is

achieved, the court reviews the previous permanency goal and enters a new permanency order. 705 ILCS 405/2—28(3) (West 2000).

At the time *Curtis B.* was decided, section 2—28(3) of the Act provided that permanency orders were appealable as a matter of right. In *Curtis B.* the State argued, and the supreme court ultimately agreed, that this statutory grant of appellate jurisdiction was unconstitutional because it was an attempt by the legislature to " 'encroach upon the exclusive power of the supreme court to regulate matters of appellate practice and procedure.' " *Curtis B.*, 203 Ill. 2d at 57, quoting *People v. Heim*, 182 Ill. App. 3d 1075, 1081 (1989). In determining the constitutionality of the review provision of section 2—28(3), the supreme court focused on whether a permanency order was appealable under the supreme court rules. To the extent that permanency orders are not appealable under the supreme court rules, the legislative provision for their appeal is a usurpation of the supreme court's authority and, therefore, unconstitutional as a violation of the separation of powers. Put another way, we must look to the supreme court rules rather than statutes to determine the characteristics of a judgment that may be appealed.

The supreme court held that a permanency order is not appealable under Supreme Court Rule 304(b)(1) (155 Ill. 2d R. 304(b)(1)) because it does not finally determine a right or status of a party. See *Curtis B.*, 203 Ill. 2d at 56, citing 155 Ill. 2d R. 304(b)(1). In doing so, the court found it significant that, by statute, a permanency order must be reviewed and reevaluated at a minimum of every six months until the permanency goal is achieved. See 705 ILCS 405/2—28(3) (West 2000). Therefore, "[n]one of the determinations contained in a permanency order can be considered set or fixed as a matter of law." *Curtis B.*, 203 Ill. 2d at 59. The court also noted that the appellants did not dispute that the placement status of a minor is not finally determined until the permanency goal is actually achieved, as opposed to when a permanency goal is put in place by a permanency order. *Curtis B.*, 203 Ill. 2d at 58-59. Because it found that permanency orders are interlocutory, the court held that the part of section 2—28(2) that provides for their review is unconstitutional and that a party wishing to appeal a permanency order must petition the appellate court for leave to appeal under Rule 306(a)(5) (166 Ill. 2d R. 306(a)(5)). *Curtis B.*, 203 Ill. 2d at 59-60.

■ Unlike the appeal in *Curtis B.*, which was brought under Rule 304(b)(1), the instant appeal was brought under Rule 301. We agree with the State that the reasoning in *Curtis B.* applies with equal force to Rule 301. Rule 304 governs cases in which a final order has been entered as to a separate part of the controversy whereas Rule 301

governs appeals from cases in which a final order has disposed of the entire controversy. *Ginnell*, 316 Ill. App. 3d at 791. If a permanency order is not a final order that disposes of even a separate part of a controversy, it certainly is not a final order that disposes of the entire controversy. Accordingly, the clear import of *Curtis B.* is that permanency orders are appealable under neither Rule 304(b)(1) nor Rule 301.

■ The State argues that the trial court's order in this case is a permanency order and, therefore, may not be appealed under *Curtis B.* This is clearly not the case. A permanency order is a specific type of order that sets a permanency goal for a minor. 705 ILCS 405/2—28(3)(a) (West 2000). The order appealed from in this case actually *achieves* a permanency goal by appointing the foster parents as guardians. Moreover, the trial court's order closed the juvenile case under section 2—31(2) of the Act (705 ILCS 405/2—31(2) (West 2000)). Since *Curtis B.*, we have held that an order closing a juvenile case under section 2—31(2) is final and appealable. *In re Alicia Z.*, 336 Ill. App. 3d 476, 494 (2002). *Curtis B.* reasoned that permanency orders are not final because they are modifiable under section 2—28, which, among other things, provides for automatic review every six months. *Curtis B.*, 203 Ill. 2d at 59-60. Section 2—23(2) of the Act provides that an order from a juvenile court is modifiable under section 2—28 "until final closing and discharge of the proceedings under section 2—31." 705 ILCS 405/2—23(2) (West 2000). An order that closes the juvenile case under section 2—31 is, therefore, not modifiable. As a result, such an order "fixes absolutely and finally the rights of the parties in the lawsuit." *Ginnell*, 316 Ill. App. 3d at 793. Further, by its very nature, closing the case "terminate[s] the litigation or some definite part of it." *Ginnell*, 316 Ill. App. 3d at 793. An order closing the case under section 2—31 is, therefore, a final order for purposes of Supreme Court Rule 301.

The State, however, argues that guardianship orders are a special case because they are modifiable even after juvenile proceedings have been closed under section 2—31(2). The State, thus, concludes that guardianship orders are *per se* not final where parental rights have not been terminated. We disagree because the Act does not provide for modification of guardianship orders after the termination of juvenile proceedings.

■ The issue before us concerns the construction of the Act. In interpreting the Act, our task is to ascertain and give effect to the true intent of the legislature, while presuming the legislature did not intend to create absurdity, inconvenience, or injustice. *In re D.D.*, 196 Ill. 2d 405, 418-19 (2001). The starting point for determining legislative

intent is always the language of the statute because it is the most reliable indicator of the legislature's objectives in enacting the particular law. *D.D.*, 196 Ill. 2d at 419.

■ As the State asserts, sections 2—23(2) and 2—28(4) of the Act (705 ILCS 405/2—23(2), 2—28(4) (West 2000)) combine to provide for modification of guardianship orders, but only until the close of the juvenile case under section 2—31. Section 2—23(2) provides in relevant part:

> "Unless the order of disposition expressly so provides, it does not operate to close proceedings on the pending petition, but is subject to modification, not inconsistent with Section 2—28, *until final closing and discharge of the proceedings under Section 2—31.*" (Emphasis added.) 705 ILCS 405/2—23(2) (West 2000).

Section 2—28(4), in turn, provides:

> "The minor or any person interested in the minor may apply to the court for a change in custody of the minor and the appointment of a new custodian or guardian of the person or for the restoration of the minor to the custody of his parents or former guardian or custodian." 705 ILCS 405/2—28(4) (West 2000).

Thus, an order of guardianship is modifiable under section 2—28(4), but only "until final closing and discharge of the proceedings under Section 2—31" (705 ILCS 405/2—23(2) (West 2000)).

The State's contention that a guardianship order is modifiable even after the close of juvenile proceedings is based on *In re P.F.*, 265 Ill. App. 3d 1092 (1994). In *P.F.*, the trial court "permanently" placed two minor children in foster care with their maternal grandmother, ordered monthly visitation by the minor's natural parents, and ordered DCFS to retain guardianship of the minors. The court did not, however, close the juvenile case in accordance with section 2—31. The appellate court reversed, finding that the trial court exceeded its statutory authority by, among other things, ordering "permanent placement." *P.F.*, 265 Ill. App. 3d at 1105.

*P.F.*'s conclusion that placement with a legal custodian or guardian could never be permanent is based on section 2—23(2)'s provision for continuing review in accordance with section 2—28. According to *P.F.*, "[s]ections [2—23(2)] and [2—28(4)][1] mandate that '[a]n order of a court depriving the parents of the custody of a child is a continuing order which is only *res judicata* as to the facts which existed at the time the order was entered and the parents have a right to petition the court for restoration of parental rights and change of custody until

---

[1]At the time *P.F.* was decided, these provisions were contained in sections 2—23(3) and 2—28(3), respectively. See Ill. Rev. Stat. 1991, ch. 37, pars. 802—23(3), 802—28(3).

the court terminates all of their legal rights to the child.' " *P.F.*, 265 Ill. App. 3d at 1105, quoting *In re S.J.K.*, 149 Ill. App. 3d 663, 673 (1986).

*P.F.* is correct that sections 2—23(2) and 2—28(4) determine when an interested party may apply for a change in custody. However, section 2—23(2) provides that a guardianship order is modifiable under section 2—28(4) only until a juvenile case is closed under section 2—31. Here, unlike in *P.F.*, the trial court closed the juvenile proceedings. Thus, to the extent that *P.F.* suggests that a guardianship order is modifiable after the close of a juvenile case, it does so in *dicta* because the juvenile proceedings in that case were never closed. Once a juvenile case is closed under section 2—31, a guardianship order ceases to be modifiable under section 2—28(4).

The quote in *P.F.*, 265 Ill. App. 3d at 110, quoting *S.J.K.*, 149 Ill. App. 3d at 673, to the effect that " '[a]n order of a court depriving the parents of the custody of a child is a continuing order which is only *res judicata* as to the facts which existed at the time the order was entered' " finds its origin not in the current statute but in a 1954 case, *In re Ramelow*, 3 Ill. App. 2d 190, 198 (1954). That case based its determination on an earlier version of the statute which, unlike the current statute, does not contain language that specifically provides for the termination of juvenile proceedings. See Ill. Rev. Stat. 1953, ch. 23, par. 190 *et seq*. For this reason, the earlier statute has no provision analogous to section 2—23(2) that cuts off modification after juvenile proceedings are terminated. These additions to the statute qualify *Ramelow*'s assertion that a guardianship order ceases to be modifiable where parental rights have been terminated. Under the current statute an order of guardianship also ceases to be modifiable where the juvenile case has been closed pursuant to section 2—31(2).

■ An amendment to the Act, enacted since *P.F.*, further supports our construction of the statute. In 1997 the legislature amended section 2—28 of the Act to provide a list of permanency goals for a court to choose from. Pub. Act 90—28, eff. January 1, 1998. One of these goals provides that "[t]he guardianship of the minor will be transferred to an individual or couple on a *permanent* basis." (Emphasis added.) 705 ILCS 405/2—28(2)(E) (West 2000). Under the State's interpretation of the statute, there can never be "guardianship on a permanent basis" unless parental rights are first terminated. The statute, however, does not provide that termination of parental rights is a prerequisite for choosing permanent guardianship as a goal. Conversely, the goal of adoption, which is listed immediately before guardianship in the statute, specifically provides that it may be chosen only "provided that parental rights have been terminated or

relinquished." 705 ILCS 405/2—28 (2)(D) (West 2000). "Where the legislature uses certain words in one instance and different words in another, it intended different results." *Dana Tank Container, Inc. v. Human Rights Comm'n*, 292 Ill. App. 3d 1022, 1026 (1997). Here the legislature expressly limited the goal of adoption to situations where parental rights had been terminated but included no similar caveat to the goal of guardianship. The legislature, therefore, did not intend to limit permanent guardianship to situations where parental rights have been terminated. The State's suggestion that an order of guardianship may be challenged at any time until parental rights are terminated adds to the goal of permanent guardianship the unintended prerequisite that parental rights be terminated. The better interpretation of the statute is that an order of guardianship is modifiable under section 2—28(4) only until termination of the juvenile proceedings under section 2—31.

Our interpretation of the statute is also consistent with the Act's purpose. In interpreting the Act, we must take into account its nature and purpose. *D.D.*, 196 Ill. 2d at 419. The stated purpose of the Act is to:

> "secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; *** removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal; *** consideration should be given so that if reunification fails or is delayed, the placement made is the best available placement *to provide permanency for the child ***.*" (Emphasis added.) 705 ILCS 405/1—2(1) (West 2000).

The State's interpretation of the Act yields not permanency but limbo for the minors in this case and those similarly situated. If an order of guardianship is perpetually modifiable even after the close of juvenile proceedings, courts that deal with minors such as E.S. and M.M., for whom return home is against their best interests but for whom adoption is not an option because parental rights have not been terminated, are left with two choices that are both against the minors' best interests. The court may either return the minors home or subject them to a continuous state of uncertainty by keeping them with their guardians. Such a rule is at odds with the statutory goals of serving children's psychological and emotional welfare and fostering permanency. Conversely, an effective middle ground between adoption and return home, such as "guardianship on a permanent basis," promotes these objectives because it allows courts a third option for permanent

placement where, as here, neither adoption nor return home is appropriate.

Accordingly, an order of guardianship is not modifiable under section 2—28(4) after juvenile proceedings are terminated under section 2—31(2).

■ The State additionally asserts that a guardianship order is modifiable after the close of the juvenile case under section 5—745(3) of the Act (705 ILCS 405/5—745(3) (West 2000)). Section 5—745(3) is part of Article 5 of the Act, which is a statutory scheme much like Article 2 except that it deals with delinquent minors as opposed to neglected minors. Just as section 2—28 provides for review of neglect cases, section 5—745 provides for review of delinquency cases. The State cites no authority for the premise that section 5—745(3) is applicable to a neglect case. The context of section 5—745 makes clear that it is meant to deal with review of delinquency cases. Moreover, other than the difference in context, section 5—745(3) is nearly identical to section 2—28(4). If section 5—745(3) applied to neglect cases, section 2—28(4) would be surplusage. We hold that section 5—745(3) is inapplicable to the case at bar.

For the foregoing reasons, we hold that an order closing the juvenile proceedings under section 2—31(2) is a final judgment for purposes of Rule 301 whether or not guardianship has been ordered.

■ The State asserts that, despite the fact that the trial court order purported to close the juvenile case, it was, for various reasons, ineffective in doing so. The State concludes that the trial court's order was, therefore, interlocutory and not appealable. To be sure, in determining whether an order is final we "look to its substance and effect rather than its form." *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 350 (2002). In our view, however, the trial court's order closing the juvenile case was final in substance as well as form.

■ First, the State contends that the trial court exceeded its authority when it closed the juvenile case. According to the State, a court simply may not close a juvenile case where there is an open order of guardianship because, under *P.F.*, guardianship orders are always modifiable. Not only is there no authority in the statute for this proposition, but section 2—31(2) specifically authorizes a court to close a juvenile case where there is an open order of guardianship:

> "Whenever the court determines, and makes written factual findings, that health, safety, and the best interests of the minor and the public no longer require the wardship of the court, the court shall order the wardship terminated and all proceedings under this Act respecting the minor finally closed and discharged. *The court may at the same time continue or terminate any*

*custodianship or guardianship theretofore ordered* but the termination must be made in compliance with Section 2—28." (Emphasis added.) 705 ILCS 405/2—31(2) (West 2000).

We hold that a court may close juvenile proceedings under section 2—31(2) where it has ordered guardianship.

■ The State next contends that, although the court could have closed the proceedings, it failed to do so because it did not make the necessary findings required by section 2—31(2). The State concludes that the order, therefore, is not final and we are without jurisdiction to hear this appeal. The State is incorrect about the effect of this type of trial court error. The failure to make necessary findings does not make an order void but "merely voidable—a reviewable error." *Miske v. Department of Children & Family Services*, 110 Ill. App. 3d 278, 280 (1982). As a result, the trial court's failure to make the proper findings would not preclude our jurisdiction to review the order but, rather, would constitute grounds for us to *reverse* it.

As to reversal, both parties waived this argument because they did not raise it before the trial court. Section 2—31(2) provides that a court should make "written factual findings[ ] that health, safety, and the best interests of the minor and the public no longer require the wardship of the court" before it closes juvenile proceedings. 705 ILCS 405/2—31(2) (West 2000). A claim that the circuit court failed to make the factual findings required by section 2—31(2) is waived where it is not objected to at the hearing where the order is entered. *In re K.S.*, 317 Ill. App. 3d 830, 833 (2000). The State has waived the argument that the trial court did not make the factual findings required by section 2—31(2) because it did not make the argument before the trial court.

■ Finally, the State argues that the trial court's order is not final because, after it closed the juvenile case, the trial court opened a probate case to oversee respondent's visitation of the minors. Initially, we note that this argument conflicts with our holding in *In re Alicia Z.*, 336 Ill. App. 3d at 494, that an order closing a juvenile case under section 2—31(2) is final. More fundamentally, the State's contention that the existence of the probate case is indicative of a lack of finality misunderstands the role of the probate case. At the close of the juvenile case, the trial court ordered that the foster parents were to be appointed as guardians of the minors and that respondent was to have visitation rights. The function of the probate case is not to revisit this decision but, rather, to enforce it by acting as an apparatus to oversee respondent's visitation.

The trial court's order was effective in closing the juvenile proceedings. Accordingly, we hold that the trial court's order is a final order and we have jurisdiction to review it under Supreme Court Rule 301.

Having found jurisdiction to be proper, we now address respondent's argument. Respondent argues that the trial court "committed manifest error" by appointing the foster parents guardians of E.S. and M.M. and closing the juvenile case.

██ The court based its decision on the best interests of the minors. When child custody proceedings are brought under the Act, the juvenile court's primary concern is the best interests of the child, and, to that end, the court is vested with wide discretion. *In re J.J.*, 327 Ill. App. 3d 70, 77 (2001). Importantly, " '[i]f the "best interests" standard can be attained only by placing the child in the custody of someone other than the natural parent, it is unnecessary for the court to find the natural parent unfit to care for the child.' " *J.J.*, 327 Ill. App. 3d at 77, quoting *In re J.F.K.*, 174 Ill. App. 3d 732, 734 (1988). We will not disturb a trial court's determination in a child custody case unless the court exceeded its broad discretion or unless its determination is against the manifest weight of the evidence. *J.J.*, 327 Ill. App. 3d at 77. A judgment is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent. *J.J.*, 327 Ill. App. 3d at 77.

██ There was ample evidence in the record to support the trial court's finding that guardianship was in the best interests of the minors. At the time the trial court decided this case, the minors had been out of respondent's care for approximately four years. Mary Leo, a family therapist who examined the children, testified that guardianship was in the best interests of the minors. According to Leo, the minors were vocal about not wanting to return home and showed an unwillingness to work toward returning home. Leo testified that E.S. had a bond with respondent but that it appeared that M.M. was confused about why she was visiting respondent. Leo testified that the minors stated that they wished to remain with their foster parents. She also opined that continued uncertainty was devastating to the minors. Additionally, Leo's conclusions were corroborated by reports submitted to the trial court by a second therapist, Gloria Rodriguez, by DCFS, and by CASA, all of whom recommended guardianship.

Respondent argues at length that DCFS's conduct was responsible for a delay that, in turn, was in part responsible for the determination that it was not in the best interests of the minors to return home. Respondent, however, does not explain why this is relevant to the trial court's decision, which was based on the minors' best interests. Additionally, the trial court agreed with respondent that DCFS was in part responsible for the delay. To the extent that consideration of DCFS's mistakes is proper in a best interests determination, respondent does not cite to anything in the record that suggests that the trial court failed to give DCFS's mistakes due weight.

Respondent additionally contends that greater consideration should have been given to her rights as a biological parent. Respondent bases her argument on *Miske v. Department of Children & Family Services*, 110 Ill. App. 3d 278 (1982). In that case a father sought custody of his natural child after the child was removed from its mother's custody on the grounds of neglect. *Miske*, 110 Ill. App. 3d at 279. Competing petitions were filed for custody. The trial court awarded custody to a third party on the basis that it was in the best interests of the minor. *Miske*, 110 Ill. App. 3d at 279. The appellate court reversed, finding that the trial court did not give consideration to the father's rights as a biological parent. In doing so, the court emphasized that the trial court considered the father merely a "custodial alternative" and that a custody petition from a parent should be more than passively examined. *Miske*, 110 Ill. App. 3d at 281-82.

The instant case is factually inapposite to *Miske* because respondent was much more than passively examined. Respondent was thoroughly examined by the trial court over the course of a four-year juvenile case. Most of this time was spent attempting to work toward the goal of reunification. The trial court, for example, ordered therapy sessions in an attempt to reunify respondent with her children. It appears from the record that the trial court's presumptive goal was return home. It was only after the effort at return home failed and it became apparent that reunification was not in the best interests of the minors that the trial court changed the permanency goal to guardianship. In custody proceedings under the Act, "a child's best interest is superior to all other factors, including the interests of the biological parents." *J.J.*, 327 Ill. App. 3d at 77. Therefore, a natural parent's superior right to custody must yield to a minor's best interests. *Miske*, 110 Ill. App. 3d at 281. The court made its determination based on the minors' best interests. We cannot say that the trial court failed to properly take account of respondent's interests as a natural parent.

Respondent asserts that "more should have been attempted before the children were placed in guardianship." Specifically, respondent contends that there should have been more counseling sessions and that more time should have been allowed before the trial court changed the permanency goal to guardianship. These assertions are not supported by citations to the record or authority and "consist of mere supposition and conjecture." *J.J.*, 327 Ill. App. 3d at 80. Moreover, they are contradicted by Leo's testimony that the delay in finding a permanent solution was devastating to the minors.

We cannot say that the trial court's decision appointing the foster parents as guardians and closing the juvenile case based on the best

interests of the minors was against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

HUTCHINSON, P.J., and BOWMAN, J., concur.