# Illinois Official Reports

## Appellate Court

---

### *In re Nevaeh R.*, 2017 IL App (2d) 170229

---

| | |
|---|---|
| Appellate Court Caption | *In re* NEVAEH R. and MARY R., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Gabriel R., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-17-0229 |
| Rule 23 order filed<br>Motion to publish<br>granted<br>Opinion filed | August 14, 2017<br><br>September 7, 2017<br>September 7, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, Nos. 13-JA-568, 13-JA-570; the Hon. Francis M. Martinez, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas E. Laughlin and Michael W. Raridon, both of Rockford, for appellant.<br><br>Joseph P. Bruscato, State's Attorney, of Rockford, (Patrick Delfino, Lawrence M. Bauer, and Stephanie H. Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Hutchinson and Birkett concurred in the judgment and opinion.


**OPINION**

¶ 1     Respondent, Gabriel R., appeals the trial court's orders finding him to be an unfit parent and terminating his parental rights. For the reasons that follow, we affirm.

¶ 2                                  I. BACKGROUND

¶ 3     Mary R. was born on November 10, 2001, and Nevaeh R. was born on April 28, 2008. On November 13, 2014, the trial court formally adjudicated respondent to be the minors' biological father. Respondent was never married to the minors' mother, Melissa O.[1]

¶ 4     On April 21, 2011, respondent was convicted of aggravated driving under the influence (DUI) that resulted in a death. He was sentenced to eight years in the Illinois Department of Corrections. He remained incarcerated at all times relevant to these proceedings. His scheduled release date was May 19, 2017.

¶ 5     In December 2013, the minors were taken into care by the Illinois Department of Children and Family Services (DCFS) after they disclosed that Melissa's paramour had touched their bodies while showering with them. On December 9, 2013, DCFS was granted temporary custody and guardianship, and the minors were placed in traditional foster care. On May 13, 2014, the minors were adjudicated neglected. On October 20, 2015, the State filed a motion to terminate the parental rights of both respondent and Melissa. With respect to respondent, the motion alleged that he was an unfit parent in that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (count I) and that he failed to make reasonable progress toward their return to him within any nine-month period after they were adjudicated neglected (count II). Count II alleged two nine-month periods: May 13, 2014, to February 13, 2015, and August 30, 2014, to May 30, 2015.

¶ 6     The unfitness hearing commenced on March 1, 2016, and continued periodically until its conclusion on July 26, 2016. With respect to respondent, the evidence showed the following. Prior to his incarceration in 2010, respondent was fully involved in the children's lives, although he had not lived with them on a daily basis since 2008. After the children went into foster care, respondent maintained contact with DCFS, sent the children cards and letters, attended all scheduled visitation sessions, and requested more frequent visitation. While incarcerated, respondent obtained a degree in cosmetology and an associate's degree in liberal arts. He also completed a parenting class.

¶ 7     DCFS conducted an integrated assessment of respondent followed by a service plan mandating him to "complete [a] substance abuse assessment and evaluation/treatment/

_____

[1]Melissa also gave birth to a third daughter, Alexis R., during her relationship with respondent. DNA testing revealed that respondent was not Alexis's biological father. Consequently, Alexis is not part of this appeal. When we refer to the "children," the "minors," or the "girls" in this opinion, we refer to Mary and Nevaeh.

counseling and follow up with [a] recommendation at the correctional facility in which he is placed" by December 30, 2014.

¶ 8 DCFS caseworker Stephanie Sanders testified that respondent did not comply with the recommended services. She testified that respondent had not inquired about a substance abuse assessment by November or December 2014. Documents in the record establish that, as of May 11, 2015, respondent had not requested or attended substance abuse classes.[2]

¶ 9 On September 2, 2016, the court orally ruled that the State failed to prove count I (failure to maintain interest, concern, or responsibility). As to count II, the court found respondent to be an unfit parent and ruled: "[Respondent] remains incarcerated and, therefore, cannot make progress. Because of [respondent's] incarceration, by law he is no closer today to being placed [sic] because he's incarcerated than he was when the children were taken into care." The court added: "I do find that the State has shown, by clear and convincing evidence, count II of [the] petition."

¶ 10 Thereafter, the court proceeded to a best-interest hearing. With respect to respondent, the evidence showed the following. Sanders testified that she had never observed the children interact with respondent, as another agency supervised the visits at the prison where respondent was incarcerated. However, Sanders reviewed the other agency's case notes regarding those visits and received reports from the children. Sanders understood that the children had a bond with respondent and enjoyed their visits with him. Sanders testified that the children and respondent also exchanged cards and letters. On cross-examination, Sanders agreed that the termination of respondent's parental rights could be detrimental to the children. She testified: "I'm not saying that [the children] won't be harmed by a termination. I think they would be harmed either way, if they stay in the foster home or go home to the parents." Sanders added that it was "up to the mercy of the court." She opined that it would be good for the children to continue to have a relationship with their biological parents.[3]

¶ 11 Sanders also testified that the children were living with the foster parents and had bonded with that family. Sanders opined that the foster parents were meeting all of the children's needs. According to Sanders, the children were vehement that they did not want to testify because they did not want to voice a choice between living with the foster parents and going home to their mother. Sanders testified that the children desired finality above all else. In Sanders's opinion, the children would benefit more from the termination of parental rights because of the support and structure offered by the foster parents. Her sense was that the children felt that they belonged more to the foster family than to their mother. Sanders testified that recently Melissa had been having unauthorized, unsupervised visits where she tried to influence the children to decide to return home. The evidence also showed that the children did not want to live with respondent.

¶ 12 Alan Nylund, the foster father, testified that the girls had lived with him and his wife for three years. Nylund testified that Mary had recently become very frustrated with how long the court proceedings were taking. At first, Mary was unable to read anything except children's

---

[2]The record shows that respondent participated in 24 hours of drug education programming from August 25, 2015, to December 22, 2015.

[3]Melissa gave birth to a baby, Brandon, during these proceedings. Brandon's father was not involved in these proceedings. Brandon was removed from Melissa's care for a period of time but was then returned to her. The record shows that the children, particularly Mary, had bonded with Brandon.

books, but she progressed to age-appropriate reading skills. Mary got along with her foster mother, although they clashed at the beginning. Nylund recounted that Nevaeh was six years old when she came to live with him and his wife, and she had bedwetting incidents. She also expressed fear of going home. According to Nylund, Nevaeh recently told him that she felt safe with the foster family. Nevaeh participated in school activities and was integrated into their larger, extended family. Nylund testified that he and his wife wanted to adopt the girls (including Alexis), and he indicated that they were willing to foster the girls' relationships with Brandon and their biological parents.

¶ 13    Respondent testified that he and the children were "inseparable" before his incarceration. He testified that he did with his girls what fathers do with their sons. Respondent testified that he regretted his crime. After his incarceration, respondent maintained his bond with the children, although in the last three years he had spent only the equivalent of three full days with them. Respondent described his jail visits with the children as "beautiful." The children pretended to make him food. Respondent testified that he had a difficult conversation with Mary when he found out that she was posting pictures of herself on the Internet. According to respondent, the children expressed a desire to continue a relationship with him, even if they were adopted by the foster parents. Mary told him that she would run away if the court terminated his parental rights. Respondent testified that he wanted whatever the children decided, whether it was to be adopted, live with their mother, or live with him. According to respondent, when the children talked to him about the future, he redirected the conversation.

¶ 14    On March 8, 2017, in ruling on the children's best interest, the court found that respondent had never turned his back on the children, despite his incarceration. However, the court noted that it had to consider the best interest of the children, not the parent, and it found that it was not in the children's best interest to wait for respondent's release from custody in May 2017 and his completion of services thereafter, which "may or may not" lead to reunification. The court found that the children engaged with the Nylunds as their own parents and thrived in the Nylunds' custody. The court further found that the children were fully integrated into the Nylunds' household and that "finality and permanency" were factors that weighed in favor of placing the children with the Nylunds. The court ruled that it was in the children's best interest to terminate parental rights. Respondent filed a timely appeal.

¶ 15                                    II. ANALYSIS

¶ 16    Respondent first argues that he was found unfit solely because he was incarcerated. Respondent contends that such a finding is inconsistent with this court's opinion in *In re Keyon R.*, 2017 IL App (2d) 160657.

¶ 17    Before addressing respondent's arguments, we review the principles applicable to termination proceedings. The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2014)) provides a two-step process for the involuntary termination of parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must prove that the parent is unfit by clear and convincing evidence. *Deandre D.*, 405 Ill. App. 3d at 952. Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2014)) lists the grounds under which a parent may be found unfit. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Second, if the court makes a finding of unfitness, the court then considers whether it is in the best interest of the minor to terminate parental rights. *Deandre D.*, 405 Ill. App. 3d at 953. The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interest.

*Deandre D.*, 405 Ill. App. 3d at 953. The appellate court will reverse a finding of unfitness only where it is against the manifest weight of the evidence, that is, where the opposite conclusion is clearly evident. *Deandre D.*, 405 Ill. App. 3d at 952. The appellate court will reverse a best-interest finding only where it is against the manifest weight of the evidence or where the trial court abused its discretion. *Deandre D.*, 405 Ill. App. 3d at 953.

¶ 18    Section 1(D)(m) of the Adoption Act contains two separate grounds, either of which can serve as a basis for a finding of unfitness. 750 ILCS 50/1(D)(m) (West 2014). Subsection (i) deals with a parent's failure to make "reasonable efforts" to correct the conditions that were the basis for the minor's removal; subsection (ii) deals with a parent's failure to make "reasonable progress" toward the return of the minor during "any 9-month period" following the adjudication of neglect. 750 ILCS 50/1(D)(m)(i)-(ii) (West 2014).

¶ 19    In addition, section 1(D)(b) of the Adoption Act provides that a parent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare is a ground for a finding of unfitness. 750 ILCS 50/1(D)(b) (West 2014).

¶ 20    Here, the State alleged in count I of the motion to terminate parental rights that respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. Count II alleged that respondent failed to make reasonable progress toward the minors' return to him within nine months after they were adjudicated neglected and/or within the nine-month period from August 30, 2014, to May 30, 2015. The court found that the State failed to prove the allegations in count I but proved the allegations in count II by clear and convincing evidence. The court needs to find a parent unfit under only one of the grounds enumerated in section 1(D) of the Adoption Act to proceed to a best-interest hearing. *Deandre D.*, 405 Ill. App. 3d at 953.

¶ 21    In finding that the State proved count II, the court remarked: "[Respondent] remains incarcerated and, therefore, cannot make progress. Because of [respondent's] incarceration, by law he is no closer today to being placed [*sic*] because he's incarcerated than he was when the children were taken into care." That statement does not accurately reflect the law. The mere fact of incarceration is not evidence of failure to make reasonable progress. *In re J.R.Y.*, 157 Ill. App. 3d 396, 403 (1987). Nevertheless, incarceration can impede progress toward the goal of reunification. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). "Reasonable progress" is an objective standard that is not concerned with a parent's individual efforts and abilities. *D.D.*, 309 Ill. App. 3d at 589; see *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89 (the respondent failed to make reasonable progress where her imprisonment prevented the children from being returned to her in the near future). Time spent in prison is included in the nine-month period during which reasonable progress must be made. *In re J.L.*, 236 Ill. 2d 329, 443 (2010).

¶ 22    Contrary to respondent's argument, this court's recent decision in *Keyon R.* is not applicable. In *Keyon R.*, we reversed a finding that the incarcerated respondent was unfit where DCFS refused to provide him with an integrated assessment or a service plan. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 30. We held that using the respondent's lack of compliance with nonexistent services to terminate his parental rights was paradoxical. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 30. In contrast, respondent in the instant case was assessed for services and was provided with a service plan.

¶ 23    A service plan is an integral part of the statutory scheme for measuring progress toward the goal of reunification of the parent and the child. *In re C.N.*, 196 Ill. 2d 181, 215 (2001). A service plan must reasonably relate to remedying the conditions that gave rise, or that could

give rise, to any finding of child abuse or neglect. 325 ILCS 5/8.2 (West 2014); *C.N.*, 196 Ill. 2d at 215. Here, respondent was incarcerated for aggravated DUI that resulted in a death. The service plan's requirement that respondent undergo an assessment and treatment for substance abuse was reasonably related to the conditions that could give rise to a finding of neglect.

¶ 24　Respondent seems to argue that the State set him up to fail by picking nine-month periods that coincided with his incarceration, or that it is unfair to expect incarcerated individuals to meet the reasonable-progress standard. However, respondent's incarceration did not prevent him from complying with the service plan. His failure to apply for the services is what resulted in his noncompliance. Even though the service plan mandated that respondent complete substance abuse assessment and treatment by December 30, 2014, the record shows that he still had not applied for classes as of May 2015. The appellate court may affirm on any basis appearing in the record, whether or not the trial court relied on that basis. *Benson v. Stafford*, 407 Ill. App. 3d 902, 912 (2010). Accordingly, we hold that the trial court's finding of unfitness is not against the manifest weight of the evidence.

¶ 25　Respondent next argues that the trial court's finding that it was in the children's best interest to terminate parental rights is against the manifest weight of the evidence. In light of Sanders's testimony that, in her opinion, the children would be harmed whether they stayed with the foster parents or went home to their biological parents, respondent argues that we should appoint the foster parents as permanent guardians or remand to the trial court for a hearing on that issue.

¶ 26　Respondent relies on *In re M.M.*, 337 Ill. App. 3d 764 (2003). *M.M.* is inapposite because the trial court there did not find the mother unfit but nevertheless could not return the children to the mother, as they had bonded more with the foster parents and resisted returning home. *M.M.*, 337 Ill. App. 3d at 768-70. The court could not terminate the mother's parental rights, so it appointed the foster parents as guardians. *M.M.*, 337 Ill. App. 3d at 770. Here, the trial court found both parents unfit.

¶ 27　The trial court must consider the following factors in making a best-interest determination: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachment, including where the child feels love, attachment, and security; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2014). Additionally, the court may consider the nature and length of the child's relationship with his or her present caretaker and the effect that a change in placement would have on his or her emotional and psychological well-being. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78. The trial court need not explicitly reference each of these factors, and this court need not rely on any basis used by the trial court in affirming its decision. *Davon H.*, 2015 IL App (1st) 150926, ¶ 78.

¶ 28　Here, the record supports the trial court's determination that termination of respondent's parental rights was in the minors' best interest. The minors were attached to the foster parents, and Nylund testified that Nevaeh particularly had a relationship with his extended family. The minors had progressed educationally and emotionally while they were with the Nylunds. The lack of finality was causing the minors great stress. Further, respondent's own testimony at the

unfitness hearing showed that he had no home for the minors. Consequently, the trial court's finding that it was in the best interest of Mary and Nevaeh that respondent's parental rights be terminated is not against the manifest weight of the evidence.

¶ 29                                III. CONCLUSION

¶ 30        For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 31        Affirmed.