NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220229-U

NO. 4-22-0229

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 29, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.W. and K.W., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois | ) | McLean County |
|       Petitioner-Appellee, | ) | No. 19JA21 |
|       v. | ) | |
| Quentrail G., | ) | Honorable |
|       Respondent-Appellant). | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, concluding the trial court's unfitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2   Respondent father, Quentrail G., appeals from the trial court's judgment terminating his parental rights to J.W. (born March 25, 2019). On appeal, respondent argues the trial court's unfitness and best-interest findings are against the manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgment.

¶ 3   I. BACKGROUND

¶ 4   The parental rights of J.W.'s mother, Valencia W., were also terminated during the proceedings below. She is not, however, a party to this appeal. In addition, the proceedings below involved another child, K.W. Quentrail G. is not, however, the father of K.W.

¶ 5   A. Petition to Terminate Parental Rights

¶ 6    In September 2021, the State filed a petition to terminate parental rights. The State alleged respondent was an unfit parent in that he, amongst other reasons which were later found to be unproven, failed to make reasonable progress toward the return of the minor to his care during a nine-month period following the minor's May 15, 2019, adjudication of neglected, namely December 15, 2020, through September 15, 2021. 750 ILCS 50/1(D)(m)(ii) (West 2020). The State further alleged it was in the minor's best interest to terminate respondent's parental rights and appoint the Department of Children and Family Services (DCFS) as guardian with the power to consent to adoption.

¶ 7    B. Hearing on the Petition to Terminate Parental Rights

¶ 8    In February 2022, the trial court conducted a hearing on the State's petition to terminate parental rights. Respondent appeared virtually, in custody, with counsel.

¶ 9    With respect to the fitness portion of the hearing, the State, as it related to respondent, moved for the trial court to take judicial notice of the pleadings, orders, and docket entries in this case, as well as certain records concerning respondent's pending criminal case and pretrial incarceration, all of which the court granted over no objection. The State also presented testimony from a caseworker who had been assigned to the case since September 2020. Respondent presented his own testimony. The following is gleaned from the evidence presented as is relevant to the allegation of unfitness concerning respondent.

¶ 10    In March 2019, the minor was taken into temporary custody as a result of his mother's failure to complete recommended services in a case involving the minor's older brother. Respondent did not appear at the hearing where temporary custody was granted.

¶ 11    In May 2019, the minor was adjudicated neglected. Respondent appeared at the hearing.

¶ 12        In early July 2019, the minor was adjudicated a ward of the court, and guardianship and custody of the minor was placed with DCFS. Respondent did not appear at the hearing where the minor was adjudicated a ward of the court. Respondent testified he did not appear at the hearing because he was working out of town.

¶ 13        In late July 2019, respondent was arrested and incarcerated in Cook County on charges of attempted murder, aggravated battery, and aggravated unlawful use of a weapon. Respondent then remained in custody through the date of the hearing on the State's petition to terminate parental rights. Respondent testified he reached out to his former caseworker upon being incarcerated and left multiple voicemails about his desire to be involved with the minor's case. Respondent explained he eventually received a letter that provided him with upcoming court dates. Respondent appeared virtually at some, but not all, of the court hearings. Respondent testified he participated in any hearing in which he had the opportunity.

¶ 14        In September 2020, the newly assigned caseworker sent respondent a certified letter introducing herself. She then continued to send monthly certified letters to respondent. The caseworker noted she observed a service plan for respondent upon taking over the case. She also noted the previous caseworker informed her that respondent had not responded to any previously mailed certified letters.

¶ 15        In November 2020, the caseworker spoke with respondent by telephone. During the phone call, respondent disclosed the status of his pending criminal case and expressed a desire to be involved in the minor's life "after being released from custody." The caseworker inquired if the jail was offering services, to which respondent indicated he was unsure and that "most things were difficult due to COVID." The caseworker informed respondent that she would be setting up a virtual integrated assessment. After some scheduling issues with the jail, the caseworker was able

to schedule the integrated assessment in April 2021.

¶ 16 In April 2021, respondent completed the virtual integrated assessment with the caseworker. Based on that assessment, the caseworker determined respondent's recommended services and goals included (1) obtaining stable housing and income, (2) completing a substance abuse evaluation, and (3) completing a parenting class. The caseworker reviewed the recommended services and goals with respondent. None of the recommended services could be completed while respondent was incarcerated because "nothing was offered through the jail."

¶ 17 In June 2021, respondent sent the caseworker a letter. In the letter, respondent indicated he was "hoping" to take a plea deal to a lesser charge to allow him to be released from custody so that he could participate in services.

¶ 18 In November 2021, respondent participated in a virtual visit with the caseworker. During the visit, respondent indicated he was "working" on taking a plea deal to a lesser charge which would "potentially put him in release from custody."

¶ 19 The caseworker testified respondent had never inquired about visiting or contacting the minor. Respondent testified he initially inquired about contacting the minor after he was incarcerated but upon receiving no response, he did not inquire further. Respondent has never sent the minor any gifts, cards, or letters. Respondent has never met the minor.

¶ 20 Respondent expressed a desire to be in the minor's life. Respondent explained he was involved in his daughter's life "as much as possible" and did not think it was "fair" to the minor to "disappear." Respondent testified he had inquired about the minor's well-being throughout the case. Respondent believed his involvement in the minor's life would give the minor a better life. Respondent testified he completed multiple "counselor forms" to see if there were any services he could complete, all of which were denied. Respondent explained he started

- 4 -

applying for services in September or October 2020, after his caseworker told him any classes would be helpful. Respondent believed he was going to be able to plead guilty to "simple aggravated battery" and then be released from custody by summer 2022.

¶ 21　　　　Based on this information, the trial court found respondent was an unfit parent in that he failed to make reasonable progress towards the return of the minor to his care from December 15, 2020, through September 15, 2021.

¶ 22　　　　After making its findings of unfitness, the trial court proceeded to the best-interest portion of the hearing. The State moved for the court to take judicial notice of the entire court file and two best-interest reports, all of which the court granted over no objection. The State also presented testimony from the minors' foster mother. Quentrail G. presented his own testimony. The following is gleaned from the evidence presented.

¶ 23　　　　The minor had resided with his foster parents since shortly after their birth. Two of the minor's siblings also resided in the home, one of whom had been previously adopted by the minor's foster parents. The minor was bonded to his foster family. The minor referred to his foster mother as "mom" and his foster father as "G-Daddy." The foster parents provided for the minor's needs and were willing to provide him with permanency through adoption. The foster mother had raised 10 children. The foster mother was 70 years old, and the foster father was 75 years old. Neither foster parent had any major health issues. The foster parents are actively engaged with the minor. In the event anything happened to the foster parents, they had a plan in place for their daughter, who was in her thirties and was involved in the minor's life, to care for the minor.

¶ 24　　　　Respondent had never met or communicated with the minor. Respondent explained he had not pursued visitations while incarcerated because he did not want the minor to see him in custody. Respondent had not completed the recommended services and goals. Respondent

explained he planned on completing the recommended services and goals upon his release from custody, which he anticipated would occur in summer 2022. Respondent believed he would "have the ball rolling" within "a six-month span from [his] release" and, "[i]n 12 months exactly, I know for a fact I'll be able to provide" for the daily needs of the minor. Respondent testified he had employment available upon his release from custody. He planned on living with his daughter's mother, who also served as a support system for him, and then eventually getting a home closer to where the minor resided with his foster family. He planned on keeping the foster family involved in the minor's life. He planned on visiting the minor as much as possible to build a relationship. Respondent believed, based upon his own experience growing up without a father, it would be in the minor's best interest to have him involved in his life.

¶ 25      The State's witnesses believed it was in the minor's best interest to terminate respondent's parental rights.

¶ 26      Based on this information and its consideration of the statutory best-interest factors found in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2020)), the trial court found it would be in the minor's best interest to terminate respondent's parental rights. The court entered a written order terminating respondent's parental rights.

¶ 27      This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29      On appeal, respondent argues the trial court's unfitness and best-interest findings are against the manifest weight of the evidence. The State disagrees.

¶ 30                                A. Unfitness Finding

¶ 31      First, respondent argues the trial court's finding he was an unfit parent is against the manifest weight of the evidence.

- 6 -

¶ 32    In a proceeding to terminate parental rights, the State must prove parental unfitness by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. A trial court's finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.* ¶ 29. A finding is against the manifest weight of the evidence "only where the opposite conclusion is clearly apparent." *Id.*

¶ 33    The trial court found respondent was an unfit parent as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)). Section 1(D)(m)(ii) provides, in part, a parent will be considered an "unfit person" if he or she fails "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected." *Id.*

¶ 34    "Reasonable progress" has been defined as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001). This is an objective standard. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227. "[I]incarceration can impede progress toward the goal of reunification." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21, 83 N.E.3d 1196; see also *In re J.L.*, 236 Ill. 2d 329, 343, 924 N.E.2d 961, 969 (2010) (holding time spent incarcerated is included in the nine-month period during which reasonable progress must be made).

¶ 35    Our supreme court has stated the benchmark for measuring a parent's progress toward reunification "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *C.N.*, 196 Ill. 2d at 216-17. Similarly, this court has stated that a parent has made reasonable progress when "the progress being made by a parent to comply with directives

given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 36        In this case, the relevant time period was December 15, 2020, through September 15, 2021. During that period, the evidence showed respondent completed an integrated assessment and was assessed for the following services and goals: (1) obtain stable housing and income, (2) complete a substance abuse evaluation, and (3) complete a parenting class. The caseworker reviewed these services and goals with respondent. Respondent, thereafter, made no progress on any of the recommended services and goals. The absence of any progress on these services ultimately prevented the trial court from any possibility of returning the minor to respondent in the near future.

¶ 37        Respondent, on appeal, contends his failure to make any progress on the services and goals which were recommended following the integrated assessment cannot be held against him because "there doesn't appear to be any written assessment that would indicate those services [and goals] were needed." He fails, however, to provide any reasoned argument or authority in support of his position. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Absent any such argument or authority, we decline to find that recommended services and goals of which a parent is undisputedly aware must be incorporated into a written assessment before the parent's progress can be evaluated on those services and goals. See *C.N.*, 196 Ill. 2d at 214-17 (rejecting the position that a parent's progress is measured only in terms of compliance with a written service plan).

¶ 38        Given the information gleaned from the evidence presented, we find the trial court's unfitness finding is not against the manifest weight of the evidence.

¶ 39                        B. Best-Interest Finding

¶ 40 Second, respondent argues the trial court's best-interest finding is against the manifest weight of the evidence.

¶ 41 "The termination of parental rights is a two-step process under which the best interests of the child is considered only after a court finds the parent unfit." *In re E.B.*, 231 Ill. 2d 459, 472, 899 N.E.2d 218, 226 (2008). At the best-interest stage, the State must prove termination is in a child's best interest by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 367, 818 N.E.2d 1214, 1228 (2004); see also 705 ILCS 405/1-3(4.05) (West 2020) (setting forth several factors a trial court must consider when determining whether termination of parental rights would be in a child's best interest). On review, this court will not reverse a trial court's best-interest finding unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883, 932 N.E.2d 1192, 1199 (2010). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 42 In this case, the evidence showed the minor had resided with his foster parents for the majority of his life. He was bonded to his foster family, and his needs were being met. The foster parents were willing to provide the minor with permanency through adoption. Conversely, respondent, who was incarcerated on pending criminal charges and had not completed the recommended services and goals, could not provide the minor with the necessary care. In addition, the minor had never met or communicated with respondent. Given the information gleaned from the evidence presented, we find the trial court's best-interest finding is not against the manifest weight of the evidence.

¶ 43                                    III. CONCLUSION

¶ 44 We affirm the trial court's judgment.

¶ 45 Affirmed.