NOTICE

Decision filed 02/25/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190436-U

NO. 5-19-0436

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* G.W.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Bond County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-3 |
| | ) | |
| J.W., | ) | Honorable |
| | ) | Ronald R. Slemer, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Welch and Justice Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's determinations that Father was unfit and that termination of his parental rights was in the minor's best interests were not contrary to the manifest weight of the evidence.

¶ 2    Respondent, J.W. (Father), appeals the judgment of the circuit court of Bond County terminating his parental rights to his minor child, G.W.W. For the following reasons, we affirm.

¶ 3    G.W.W. was born on September 20, 2011, and is the biological child of Father and A.W. (Mother). Mother's parental rights were terminated on September 4, 2019, but she

1

is not a party to this appeal. Father is not the biological father of Mother's other child, G.B., who was born on July 21, 2010, and has been living with his maternal grandparents (Grandparents) since September 2017.

¶ 4 On March 8, 2018, Father failed to send G.W.W. to school. On March 9, 2018, G.W.W. came to school wearing dirty clothing, smelling strongly of cat urine, and wearing shoes twice his size. On March 11, 2018, the Illinois Department of Children and Family Services (DCFS) received a hotline call reporting the March 9, 2018, incident. DCFS launched an investigation.

¶ 5 During its investigation, DCFS learned that Father had not sent G.W.W. to school on March 12, 2018, because G.W.W. did not have any clean clothes and they were living in a hotel. DCFS learned from Mother that Mother suffered an overdose on March 9, 2018, on pills given to her by Father. Mother reported to DCFS that illegal drugs were kept in the hotel room and that Mother did not think G.W.W. was safe with Father because Father hallucinates when he uses methamphetamine. Father told the investigator that he and Mother went on a "partying frenzy" when they received their tax return. When the investigator asked Father about G.W.W.'s whereabouts the preceding week, Father indicated he was unable to remember details of the last several days. The DCFS investigator reported that G.W.W. indicated that he goes with Father to get Father's "medicine." G.W.W. stated his Father pulls up to a stop sign or a fire hydrant in either Granite City or St. Louis, where Father hands men money and the men give Father pills. G.W.W. reported that Father falls asleep after taking his "medicine," and that G.W.W. is

unable to wake Father. G.W.W. stated he makes his own meals and watches television while Father sleeps.

¶ 6    The State filed a petition for adjudication of wardship of G.W.W. and G.B. on March 13, 2018, which was subsequently amended. The amended petition alleged G.W.W. was neglected (1) pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because his environment was injurious to his welfare due to ongoing concerns regarding Mother and Father's substance abuse and ability to care for him; and (2) pursuant to section 2-3(1)(a) of the Act because Father did not provide G.W.W. with the necessary care, including adequate food, clothing, and shelter.

¶ 7    On March 13, 2018, the State filed a motion for temporary custody alleging that it was a matter of immediate and urgent necessity for the protection of the minors that the minors be placed in shelter care. On March 14, 2018, following a hearing, the trial court found there was probable cause to believe the minors were neglected and entered an order giving temporary custody of the minors to DCFS. The minors were placed in foster care with Grandparents.

¶ 8    On April 13, 2018, the court conducted an adjudication hearing. The trial court adjudicated G.W.W. neglected, finding the State proved by clear and convincing evidence that G.W.W. suffered from a lack of support, education, and remedial care, as defined by 705 ILCS 405/2-1(1)(a); and was in an environment that was injurious to his welfare, as defined by 705 ILCS 405/2-3(1)(b). In a docket entry, the court noted that Father was 28 minutes late to the hearing, arriving as the proceeding was finishing. The

court characterized Father's behavior at the hearing as "erratic and odd" and ordered Father to submit to a drug test. The results of Father's urinalysis were positive for THC, morphine, and fentanyl.

¶ 9 On April 21, 2018, Father was arrested and charged with drug-induced homicide, a Class X felony. 720 ILCS 5/9-3.3 (West 2018). DCFS conducted an integrated assessment of Father and, on May 24, 2018, instituted Father's first service plan. Father's service plan required him to perform the following tasks: (1) complete a substance abuse assessment and follow all recommendations in the assessment, (2) attend parenting classes, and (3) complete a mental health assessment and follow all recommendations in the assessment. On June 13, 2018, the court entered an order of disposition finding G.W.W. was neglected and made him a ward of the court.

¶ 10 On June 26, 2019, the State filed a petition to terminate Father's parental rights to G.W.W. The State alleged Father was an unfit person, in that he had (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare, (2) failed to make reasonable efforts toward the return of the minor to Father within nine months after the adjudication of neglect, and (3) failed to make reasonable progress toward the return of the minor to Father within nine months after the adjudication of neglect.

¶ 11 On September 20, 2019, the court held a fitness hearing. During the hearing, the State dismissed the first allegation of unfitness against Father. Following the presentation of evidence, the court found by clear and convincing evidence that Father was an unfit person for failing to make reasonable efforts to correct the conditions that were the basis

4

for removal of the minor during the nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2018)), and for failing to make reasonable progress toward the return of the minor in the nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2018)). The court then proceeded to the best-interest hearing, after which the court took the matter under advisement. On September 27, 2019, the court entered an order finding it was in G.W.W.'s best interests that Father's parental rights be terminated.

¶ 12    On appeal, Father argues that the trial court's determinations that he was unfit and that the termination of his parental rights was in the best interests of the child were against the manifest weight of the evidence. We disagree.

¶ 13    Section 2-29 of the Act sets forth a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). First, the State must prove by clear and convincing evidence that the parent is an unfit person as defined by the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent to be unfit, the court must then determine whether the State has proven, by a preponderance of the evidence, that it is in the child's best interest that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2018); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). During the second stage of the proceedings, the focus of the court's scrutiny shifts from the rights of the parents to the best interests of the child. *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008).

¶ 14    The trial court's decision to terminate parental rights involves factual findings and credibility assessments which, on review, are accorded great deference. *In re M.J.*, 314

5

Ill. App. 3d 649, 655 (2000). On appeal, the trial court's findings of parental unfitness and that termination of parental rights was in the child's best interests will not be disturbed unless they are contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998, 1001 (2004).

¶ 15                           Determination of Unfitness

¶ 16    Here, the trial court concluded that the State had successfully proven two grounds of unfitness against Father. The court found that Father failed to make reasonable efforts to correct the conditions that were the basis for removal of the minor during the nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2018)), and that he failed to make reasonable progress toward the return of the minor in the nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2018)). The trial court's finding of unfitness will stand if it is supported by any one of the grounds set forth in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2018); *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004), *aff'd*, 215 Ill. 2d 340 (2005).

¶ 17    In this case, we begin our analysis by examining the trial court's finding that Father was unfit for failing to make reasonable progress toward the return of the minor in the nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2018)). "Reasonable progress" is an objective standard, based upon the amount of progress as measured from the conditions existing at the time of removal. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable progress" requires a measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. A parent has made "reasonable progress" when the trial court can

6

conclude that it will be able to return the child to parental custody in the near future. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. If a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, a "failure to make reasonable progress" includes a parent's failure to substantially fulfill his obligations under the service plan. 750 ILCS 50/1(D)(m) (West 2018). The trial court should only consider evidence occurring during the relevant nine-month period mandated in section 1(D)(m) in determining whether a parent has made reasonable progress toward the return of the child. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 18.

¶ 18    We hold the trial court did not err in finding that Father was unfit under section 1(D)(m)(ii) of the Adoption Act for failing to make reasonable progress toward the return of G.W.W. during the nine-month period following the adjudication of neglect between April 13, 2018, and January 13, 2019. The evidence indicates that G.W.W. was brought into care on March 14, 2018, due to unsanitary living conditions and the exposure to both Mother and Father's substance abuse. The caseworker, Beverly Case (Case), reported G.W.W. did not have adequate clothing, slept on the floor, and was receiving inadequate supervision.

¶ 19    Father's first service plan was created on May 24, 2018, at which time Father was incarcerated in the Bond County jail. Case testified at the unfitness hearing that Father was incarcerated in the Bond County jail from April 21, 2018, to November 28, 2018. No services were offered at the Bond County jail. Therefore, Father made no progress on his service plan during this period of incarceration. After Father pled guilty to a reduced charge, Father was transferred to the Illinois Department of Corrections (DOC), the

Graham Correctional Center. On December 2, 2018, Father was then transferred to the Jacksonville Correctional Center.

¶ 20   The evidence indicates that Father began a substance abuse treatment program while he was incarcerated at the Graham Correctional Center, which was during the relevant nine-month period following the adjudication of neglect. DOC reported, however, that Father did not complete Phase I of a substance abuse treatment program, which is a 90-day orientation phase, at the Jacksonville Correctional Center until January 28, 2019. DOC reported that, as of July 17, 2019, Father was enrolled in Phase II of the substance abuse treatment program, which focused on core skills and principles of recovery, and enrolled in mandatory adult basic education classes. Father was scheduled to complete Phase II on September 10, 2019, at which point he would have moved on to Phase III, which focused on parenting. DOC reported that Father had not received a mental health evaluation because the evaluation was "re-done once released anyway [so] they focus their caseload on offenders that need immediate and current care and services."

¶ 21   Father testified at the unfitness hearing that he was currently in the adult basic education program and in Phase III of the substance abuse treatment program. Father stated his current projected outdate was December 17, 2019, but that his scheduled release date would be November 10, 2019, once he completed the adult education program.

¶ 22   Case testified that Father was currently working all of the services available to him. The undisputed evidence, however, was that from April 13, 2018, to January 13,

2019, the nine-month period following the adjudication of neglect, Father had completed no services and was rated unsatisfactory on each of the tasks in his service plan.

¶ 23    On appeal, Father argues the trial court erred in finding he failed to make reasonable progress toward the return of the minor because no services were available to Father while he was in the Bond County Jail and Father enrolled in services as soon as they became available to him. The time a parent spends incarcerated is included in the nine-month period during which reasonable progress must be made. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. While incarceration itself is not evidence of a failure to make reasonable progress, a parent's incarceration may impede his or her progress toward the goal of reunification. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. But, as already noted, "reasonable progress" is an objective standard, unconcerned with a parent's individual efforts and abilities. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21. As such, even if Father's incarceration impeded his progress toward reunification, "reasonable progress" requires an objective analysis of whether Father made a measurable or demonstrable movement toward reunification by correcting the conditions that were the basis for removal.

¶ 24    In this case, it is undisputed that Father failed to make any measurable movement toward reunification during the nine-month period following the adjudication of neglect. The fact that Father was incarcerated during this period does not exempt him from the statutory requirements. Based upon the evidence presented, the trial court's finding that Father was unfit for failing to make reasonable progress toward the return of G.W.W. was not against the manifest weight of the evidence. Because a finding of unfitness will

stand if supported by any one of the grounds set forth in section 1(D) of the Adoption Act, we need not address the trial court's finding that Father was also unfit for failing to make reasonable efforts to correct the conditions that were the basis for removal.

¶ 25                    Determination of the Minor's Best Interests

¶ 26    Once a parent has been found to be unfit, the parent's rights yield to the child's best interests. *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002). Again, this court will not reverse the trial court's determination as to the child's best interests unless it is contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d at 1001.

¶ 27    In determining the best interest of the child, the statute requires the court to consider certain enumerated factors in the context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2018). These factors include (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including the familial, cultural, and religious ties; (d) the child's sense of attachments, which includes where the child actually feels love, attachment, and a sense of being valued, the child's sense of security and familiarity, the continuity of affection for the child, and the least disruptive placement alternative for the child; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS

10

405/1-3(4.05) (West 2018). The trial court's best-interests determination does not need to contain an explicit reference to each of these factors. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 28 On appeal, Father argues the trial court erred in finding that it was in G.W.W.'s best interests that Father's parental rights be terminated because he and G.W.W. are bonded, Father has accepted his addiction issues, and he continued to work all services available to him while incarcerated. Father contends his testimony at the hearing wherein he recognized that G.W.W. needs to continue his relationship with Grandparents and his sibling G.B. demonstrated that Father will place G.W.W.'s needs before his own.

¶ 29 Although Father began working services once they became available to him, it is undisputed that he had not completed all of the required services at the time of the hearing. Also, while Father acknowledged his addiction at the hearing, Father minimized his level of addiction and the effects his addiction had on G.W.W. Specifically, Father denied that G.W.W. was living in substandard conditions when he was taken into protective custody, asserting that G.W.W. was "fine" and had adequate clothing and food. Father asserted he had been a "functioning" drug addict, who had continued to work and remained capable of caring for G.W.W. while Father was using. At the hearing, Father denied they were living in the hotel when G.W.W. was taken into protective custody, asserting they had been there only two days and had gone swimming while at the hotel. Father denied G.W.W.'s detailed reports to DFCS that when Father went to buy drugs, he had taken G.W.W. along. Father asserted that G.W.W. ate "normally," in contradiction to G.W.W.'s reports that he ate from a can and frequently had to feed

11

himself while Father was in an unrousable stupor after taking "his medicine." This testimony by Father suggests that he does not appreciate G.W.W.'s basic needs, and it does not bode well for Father's willingness or ability to provide for G.W.W.'s needs in the future.

¶ 30   The State presented evidence at the best-interest hearing indicating that G.W.W. was being fostered by Grandparents, and had resided with them since March 2018, immediately following his removal from Father's custody. Grandparents have been continuously caring for G.B., the minor's half-brother, since September 2017.

¶ 31   Grandmother testified she had been concerned about the welfare of G.W.W. and G.B. before they came into her care because the children were not properly dressed or fed, and it did not appear that Mother and Father were caring for the children. Grandmother testified she was able to obtain custody of G.B. in September 2017, but despite her calls to DFCS, she was not able to obtain custody of G.W.W. until March 2018. Grandmother testified when she went to the hotel to pick up G.W.W. in March 2018, G.W.W. told Grandmother that Father had gone to the city to "get medicine." G.W.W. had been left in the care of three individuals Grandmother believed to be drug addicts. G.W.W. was wearing only a Halloween costume and did not have any underwear, socks, or shoes. Grandmother testified that when G.W.W. initially came to live with Grandmother, G.W.W. would not eat normal food and insisted on eating food directly from a can.

¶ 32   When he entered foster care, G.W.W. was behind in school and had to repeat kindergarten. Grandmother testified G.W.W. was now doing well in school, was

interacting well with his peers, and had friends. Grandmother testified that she and Grandfather have been foster parents in the past and they have three other adopted children at home. Grandmother testified that G.W.W. and G.B. are very close, and that G.W.W. has been integrated into the family. G.W.W. reported wanting to stay in Grandparents' home with G.B. Grandmother testified that she and Grandfather love G.W.W. and G.B., and they want to adopt both children.

¶ 33   Again, it is undisputed that Father failed to make the necessary progress to complete the objectives of his service plan. Perhaps more importantly, the record reveals that Father does not recognize the harm he inflicted upon his child. At the hearing, Father repeatedly refused to take responsibility for his actions, going so far as to deny that G.W.W. was living in substandard conditions when he was removed from Father's care.

¶ 34   By contrast, G.W.W.'s needs were being met in his foster home, a family placement he has been in since March 2018. G.W.W. is bonded to his foster family, especially his half-brother, and his foster parents wish to adopt both children. Based on the circumstances presented, the trial court's determination that termination of Father's parental rights was in the best interests of G.W.W. is not contrary to the manifest weight of the evidence.

¶ 35                                    CONCLUSION

¶ 36   For the foregoing reasons, we affirm the judgment of the circuit court of Bond County.

¶ 37   Affirmed.

13