2020 IL App (2d) 190798-U
No. 2-19-0798
Order filed February 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* J.C., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 18-JA-279 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Ryan C., | ) | Francis M. Martinez, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's finding that respondent was unfit due to his repeated incarceration was not against the manifest weight of the evidence. In addition, the court's finding that termination of respondent's parental rights was in J.C.'s best interest was not against the manifest weight of the evidence. Therefore, we affirmed.

¶ 2   Respondent, Ryan C., appeals from the trial court's orders finding him unfit and terminating his parental rights. For the reasons stated herein, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4   Respondent is the father of J.C., who was born July 28, 2017. On August 27, 2018, the Department of Children and Family Services (DCFS) received a hotline report alleging inadequate supervision of a minor. J.C.'s mother, Jasmine P., was found unconscious in her car with J.C. in

the backseat. J.C. was sweaty and dehydrated, and Jasmine was arrested for child endangerment, driving under the influence, and driving with a revoked license. Jasmine admitted to using heroin the previous day, and she had a history of substance abuse. At the time that J.C. was taken into DCFS custody, respondent was incarcerated.

¶ 5 On August 29, 2018, the State filed a two-count neglect petition for J.C., and the petition also sought termination of respondent's parental rights. The petition alleged two counts that respondent was unfit under section 1(D) the Adoption Act (750 ILCS 50/1(D) (West 2018)): (1) J.C. was in the custody or guardianship of DCFS, respondent was incarcerated at the time of the petition, and his repeated incarceration for criminal convictions prevented him from discharging his parental responsibilities (750 ILCS 50/1(D)(s) (West 2018)); and (2) respondent was depraved (750 ILCS 50/1(D)(i) (West 2018)).

¶ 6 A DCFS service plan filed on October 23, 2018, provided that respondent needed to attend available services while incarcerated, such as for substance abuse, counseling, anger management, domestic violence, and parenting. An integrated assessment filed the same day provided that respondent had not been interviewed prior to completion of the report, as he had been incarcerated since May 2017. It further noted that he had never had personal contact with J.C., that his parole date was set for May 20, 2019, and that he had a history of incarceration on drug related convictions since 1995. The assessment's prognosis was poor for respondent's reunification with J.C. within 12 months. The prognosis was based on his current incarceration and the likelihood of future criminal behavior supported by his history of drug-related incarcerations.

¶ 7 Beginning March 15, 2019, the court began an expedited combined hearing on the neglect and unfitness allegations. Molly Giese testified for the State as follows. She was a foster care case manager, and she had been assigned to J.C.'s case from around August 2018 until October 2018.

Respondent was incarcerated for the duration of her work on J.C.'s case. Respondent was unable to provide food or clothing for J.C., and he was unable to care for or comfort him. Respondent was also unable to bathe him, take him to doctor appointments, or provide him a home. During her time on the case, he was unable to provide monetary support for J.C., and he had no visitation with the child. The reason respondent was unable to do any of these things was because of his incarceration. J.C.'s foster parent provided for his daily care.

¶ 8     Tiffany Wasilewski also testified as follows. She was an adoption specialist, and she was assigned as J.C.'s caseworker since October 2018. During her time as his caseworker, respondent was incarcerated. Due to his incarceration, he was unable to provide J.C. with food, clothing, comfort, or financial support. Respondent had asked for visitation with J.C., but he had not had any visitation.

¶ 9     The State also introduced documentary evidence at the hearing, including six certificates of conviction for respondent. People's exhibits 7 through 12 were for respondent's following convictions, respectively: a June 26, 2009, conviction for unlawful delivery of a look-alike controlled substance; a February 24, 2010, conviction for unlawful possession of a controlled substance; a November 1, 2012, conviction for the same; a March 14, 2014, conviction for unlawful delivery of a controlled substance; a January 31, 2017, conviction for unlawful possession of a controlled substance; and a May 31, 2017, conviction for aggravated battery of a pregnant person.

¶ 10    The hearing was continued to May 21, 2019, where respondent testified as follows. He had recently been released from prison on May 17, 2019, after 24 months' detention. He had been in contact with Wasilewski while he was incarcerated, including to discuss possible family placements for J.C. He had given her some names to contact for placement. After he completed

an integrated assessment, he received a service plan. His service plan recommended services for substance abuse, anger management, domestic violence, and parenting classes. The only service he was able to complete during his incarceration was the parenting class. He inquired about the other services, but he was unable to engage in them, either because he did not hear back about the service or because he would have been released before the service could be completed. After his release, he began looking for providers for his remaining services. On cross-examination, respondent admitted that his most recent conviction for aggravated battery against a pregnant woman was for a battery against Jasmine while she was pregnant with J.C.

¶ 11    On June 27, 2019, the trial court adjudicated J.C. neglected, and it also found respondent unfit on both counts. For count one (repeated incarceration), the court explained that respondent had been in custody for the entire time of J.C.'s life until his recent release. The court was "certainly glad [respondent was] out." It found, however, that his most recent incarceration had denied him the ability to parent J.C. for the entirety of the minor's life: respondent had been unable to support J.C., to comfort him, or to engage in normal parental responsibilities. Turning to count two (depravity), the court found that respondent had over three felony convictions, with two convictions entered within the last five years. Moreover, the court did not find any evidence of rehabilitation to overcome the presumption of depravity arising from his convictions. Rather, it heard "aspirations" that respondent planned to rehabilitate himself. It noted he had a long history of felony convictions, including the most recent conviction for domestic violence, which demonstrated an "acceleration of anti-social behavior."

¶ 12    The case proceeded to a July 15, 2019, combined dispositional and best interest hearing. Wasilewski, the adoption specialist, testified at the best interest hearing as follows. J.C. and his foster mother were "very bonded towards each other." The foster mother's home was safe and

appropriate for J.C., and she was willing to adopt him. J.C had relationships with his foster mother's parents, sisters, niece, and nephew. Respondent had begun visitation with J.C. after he was released from prison, but to her knowledge, he had never met J.C. prior to his release. By the time of the hearing, respondent had had two visitations with J.C., and he interacted appropriately at the visitations. At first during their visitation, J.C. was "standoffish," but he later warmed up to respondent. After their second visit, J.C. gave respondent a hug.

¶ 13 Wasilewski continued that respondent had completed a parenting class during his incarceration, but he was unable to complete his other services before his release. At the time of the best interest hearing, respondent was engaged in substance abuse and anger management services. Respondent had also provided Wasilewski with relatives to contact for possible parenting placements, but none were willing to take the placement. Wasilewski further testified that it was in J.C.'s best interest to terminate parental rights.

¶ 14 Respondent also testified at the best interest hearing as follows. He currently resided in Aurora with extended family. He did not have a job at the time of the best interest hearing; his family supported him. After his release from prison, he was electronically monitored, and he was supposed to be monitored until July 17, 2019. He was allowed normal movement from 8 a.m. to 2 p.m. on Mondays, Wednesdays, and Fridays. He believed there was room for J.C. at his current residence, and his extended family that he lived with supported his reunification with J.C. Since his release, he had pursued additional services. He was able to begin substance abuse and anger management services because Medicaid covered them, but he was unable to afford domestic violence services.

¶ 15 On August 13, 2019, the trial court delivered its decision. It found that termination of respondent's parental rights was in J.C.'s best interest. In support, it found that J.C. was clearly

bonded to and integrated with his foster parent, and the foster parent was willing to provide permanence for him in a safe and stable environment. J.C. was also integrated with the foster parent's extended family. The foster parent had been responsible for J.C.'s well-being and continued to be responsible. The court set J.C.'s plan to adoption. Accordingly, the court ordered respondent's parental rights terminated.

¶ 16     Respondent timely appealed.

¶ 17                                   II. ANALYSIS

¶ 18     Respondent makes three arguments on appeal: (1) the State failed to prove by clear and convincing evidence that he was unfit to parent J.C. because of his repeated incarcerations; (2) the State failed to prove by clear and convincing evidence that he was unfit to parent J.C. due to depravity; and (3) the State failed to prove by a preponderance of the evidence that termination of his parental rights was in J.C.'s best interest. We address his arguments in turn.

¶ 19                         A. Unfitness – Repeated Incarceration

¶ 20     Respondent first argues that the State failed to prove unfitness based on his repeated incarceration. Respondent admits that he was incarcerated at the time J.C.'s neglect petition was filed and that he was previously incarcerated for felony convictions. He argues, however, that his incarceration did not prevent him from discharging his parental responsibilities. He argues that many services recommend for him were not available while he was incarcerated, but after his release, he pursued anger management and substance abuse counseling. Respondent asked to have visitation with J.C. while incarcerated, and he began to have visitation with J.C. after his release. Respondent cites *In re Gwynne P.*, 215 Ill. 2d 340 (2005), to support his contention that his efforts after his release from prison overcame his prior shortcomings and demonstrated that he was no longer the same person he was before.

¶ 21    The State responds that clear and convincing evidence demonstrated that respondent's repeated incarceration prevented him from discharging his parental responsibilities. It points to respondent's six felony convictions from 2009 to 2017. The convictions included felony possession of a controlled substance, felony unlawful delivery of a controlled substance, and felony aggravated battery of a pregnant person, with that person being J.C.'s mother, Jasmine. While it concedes that respondent has made some efforts with respect to parenting, the State argues his efforts do not equate with an ability to discharge his parental duties. The State concludes that, at best, respondent's efforts show that he might be able to discharge his parental duties at some point in the future, if he successfully completes all his service plan requirements.

¶ 22    We reject respondent's argument. Under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)), the involuntary termination of parental rights is a two-step process. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 17. In the first step, the State must prove by clear and convincing evidence that the parent is unfit under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *Id.* We will reverse a finding of unfitness only if it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Id.*

¶ 23    Under section 1(D)(s) of the Adoption Act, a parent is unfit if (1) the "child is in the temporary custody or guardianship of [DCFS]," (2) "the parent is incarcerated at the time the petition or motion for termination of parental rights is filed," (3) "the parent has been repeatedly incarcerated as a result of criminal convictions," and (4) "the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2018); see *In re Gwynne P.*, 215 Ill. 2d at 355 (addressing the four elements of section 1(D)(s) of the Adoption Act). Respondent does not dispute the first three elements,

conceding that J.C. was in DCFS custody, that respondent was incarcerated at the time the State filed its neglect petition that also sought termination of his parental rights, and that he had a history of repeated incarcerations. The only element respondent disputes is the fourth element.

¶ 24    In analyzing whether repeated incarceration has prevented a parent from discharging parental responsibilities, we consider the overall impact repeated incarceration has had on the parent, " 'such as the diminished capacity to provide financial, physical, and emotional support for the child.' " *In re Gwynne P.*, 215 Ill. 2d at 356 (quoting *In re D.D.*, 196 Ill. 2d 405, 421 (2001)). Under section 1(D)(s), we may consider incarceration that predates the child's birth if it has impeded the parent's ability to obtain appropriate life skills or to provide the child with care and support. *Id.* Relevant evidence may include social worker testimony about whether the parent provided a stable home or financial and emotional support in the first few years of the child's life. *Id.* Section 1(D)(s)'s relevant time period begins with the parent's incarceration and continues until the time the termination hearing is conducted. *Id.* at 358.

¶ 25    Here, the trial court's finding of unfitness was not against the manifest weight of the evidence. The record is clear that respondent's repeated incarceration included the time when J.C. was born, and he was not released from prison until after the combined neglect and unfitness hearing had begun on March 15, 2019. He was released only four days prior to the hearing's continuance on May 21, 2019. Thus, respondent's most recent incarceration denied him the ability to exercise his parental responsibilities for effectively the entire relevant statutory period in this case, that is, from the time J.C. was born until the trial court's consideration of the unfitness allegations. See *In re Gwynne P.*, 215 Ill. 2d at 358 (under section 1(D)(s) of the Adoption Act, courts must consider how incarceration has affected a person's ability to parent throughout the period from when the person went to jail until the court considers the fitness allegations). Although

respondent may have made later efforts toward parenting J.C., such as attending visitation and enrolling in anger management and substance abuse classes after his release from prison, those efforts were made after the fitness hearing concluded and therefore were beyond the relevant statutory timeframe.

¶ 26    In addition, respondent was not employed at the time of either the unfitness hearing or the best interest hearing, and he had been unable to complete all his recommended services while in prison. Even at the time of the best interest hearing, which took place about two months after the unfitness hearing, respondent testified that he was electronically monitored and therefore able to have normal movement only three days a week between the hours of 8 a.m. and 2 p.m., which affected his ability to gain employment.

¶ 27    Finally, the trial court's decision was supported by the testimony of social workers. At the unfitness hearing, Giese testified that due to respondent's incarceration, he was unable to provide J.C. with comfort or support, including food, clothing, and shelter. Wasilewski, who was J.C.'s caseworker after Giese, echoed her testimony. Accordingly, the trial court's finding of unfitness due to repeated incarceration was not against the manifest weight of the evidence.

¶ 28                                  B. Unfitness - Depravity

¶ 29    Respondent also argues that the State did not prove his unfitness due to depravity. However, a circuit court does not need to find more than one basis for unfitness (*In re Addison R.*, 2013 IL App (2d) 121318, ¶ 35), and we have already held that its finding on the first count of unfitness was not against the manifest weight of the evidence. Accordingly, we do not address respondent's argument on the second count of unfitness.

¶ 30                                  C. Best Interest

¶ 31    Respondent's final argument is that the State did not prove that the termination of his parental rights was in J.C.'s best interest. He cites Wasilewski's testimony that, by his second visitation with J.C., the child was showing signs of affection for respondent. He also argues that, due to his incarceration, he could not have played any role in the circumstances giving rise to J.C.'s neglect petition, and there were no allegations that respondent endangered J.C.'s safety.

¶ 32    The State responds that Wasilewski testified that J.C. was very bonded with his foster mother and integrated with her extended family. J.C.'s foster mother was willing to adopt him, which would provide him permanence and a safe and stable environment. The State continues that while respondent was not directly responsible for the conditions that brought J.C. into DCFS's custody, his incarceration prevented him from intervening on J.C.'s behalf or providing custodial care.

¶ 33    We reject respondent's argument. After the State has proved parental unfitness, as it did here, it must then prove termination is in the best interests of the child. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 17. At the best interest hearing, the focus shifts to the child, and the issue is no longer whether parental rights can be terminated but whether they should be terminated. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). That is, at a best interest hearing, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.*

¶ 34    In making a best-interest determination, the Act sets forth the following factors the trial court is to consider in light of the child's age and developmental needs: (a) the physical safety and welfare of the child; (b) the development of the child's identity; (c) the child's background and ties; (d) the child's sense of attachments; (e) the child's wishes and long-term goals; (f) the child's community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018). In addition, the court may consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have on his emotional and psychological well-being. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 27. The trial court need not explicitly reference each factor, and a reviewing court need not rely on any basis used by the trial court in affirming its decision. *Id.* We will reverse a best-interest finding only if it is against the manifest weight of the evidence or is an abuse of discretion. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 17.

¶ 35    Here, the trial court's finding that termination of respondent's parental rights was in J.C.'s best interest was supported by Wasilewski's testimony. She testified that J.C. and his foster mother were "very bonded towards each other." Wasilewski continued that the foster mother was willing to adopt J.C., and he had relationships her parents, sisters, niece, and nephew. As for possible parenting placements, respondent had provided Wasilewski with relatives to contact, but none were willing to adopt J.C. Wasilewski further testified that it was in J.C.'s best interest to terminate respondent's parental rights.

¶ 36    In contrast with the foster mother, respondent had been incarcerated for almost the first two years of J.C.'s life and therefore had been unable to provide him with care or support. Moreover, his incarceration was due to a battery against J.C.'s mother while she was pregnant with J.C. Respondent had visited with J.C. only twice since his release, and he had not yet completed all his services. He was currently unemployed and was living with extended family. Given these facts as well as Wasilewski's testimony, the trial court's finding that termination of parental rights was in J.C.'s best interest was not against the manifest weight of the evidence or an abuse of discretion.

¶ 37                               III. CONCLUSION

¶ 38     For the reasons stated, we affirm the judgment of the Winnebago County circuit court.

¶ 39     Affirmed.