2022 IL App (2d) 210586-U
Nos. 2-21-0586 & 2-21-0587 Cons.
Order filed January 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* K.R., a Minor | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| | ) | |
| | ) | No. 18-JA-2 |
| | ) | |
| (The People of the State of Illinois, Petitioner-Appellee, v. Paul R., Respondent-Appellant). | ) | Honorable |
| | ) | Ronald G. Matekaitis, |
| | ) | Judge, Presiding. |

| | | |
|---|---|---|
| *In re* P.R., a Minor | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County |
| | ) | |
| | ) | No. 18-JA-3 |
| | ) | |
| (The People of the State of Illinois, Petitioner-Appellee, v. Paul R., Respondent-Appellant). | ) | Honorable |
| | ) | Ronald G. Matekaitis, |
| | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's rulings that respondent was an unfit parent as to his children were not against the manifest weight of the evidence. Therefore, we affirm.

¶ 2    Respondent, Paul R., appeals from the trial court's orders finding him unfit as to his daughter, K.R., and his son, P.R., and terminating his parental rights. Respondent argues that the trial court's rulings were against the manifest weight of the evidence. We affirm.

¶ 3                              I. BACKGROUND

¶ 4    K.R. was born on December 9, 2014, and P.R. was born on December 12, 2017. Both children were born to respondent and Lea B. Only respondent's parental rights are at issue in this appeal.

¶ 5    On January 11, 2018, the State filed a petition alleging that the infant P.R. was abused (see 705 ILCS 405/2-3(2)(ii) (West 2018)) because respondent admitted creating a substantial risk of physical injury in that he admitted shaking P.R., causing multiple brain hemorrhages. The petition also alleged that P.R. was neglected because his environment was injurious to his welfare (see 705 ILCS 405/2-3(1)(b) (West 2018)) in that Lea did not consider respondent to be a safety risk to P.R. The State filed a separate petition alleging that K.R. was abused and neglected based on the incident with P.R. The same day, the trial court found probable cause for the petition as to K.R. and gave temporary custody of her to the Department of Children and Family Services (DCFS). The following day, the trial court appointed Court Appointed Special Advocates (CASA) as guardian *ad litem* for the children.

¶ 6    A DCFS service plan dated February 20, 2018, stated that respondent was to, among other things, engage in counseling, cooperate with any resulting recommendations, cooperate with any urine or blood tests, provide consents for the release of information, demonstrate progress on the issue of substance abuse, maintain contact with the children by sending cards and letters, and complete parenting classes. The plan stated that respondent was incarcerated in the De Kalb County jail where he was participating in weekly individual and group counseling and attending

church. He had completed the "5 week life skills" program and received a certificate. Parenting classes were not currently offered in the jail.

¶ 7    On March 14, 2018, the trial court found probable cause for the petition for P.R. based on respondent admitting to shaking P.R. and Lea not considering respondent to be a safety risk to the children. Temporary custody of P.R. was given to DCFS.

¶ 8    A visitation plan dated August 17, 2018, stated that the children would begin visitation with respondent at the De Kalb County jail. The visitation would be every other week for the first 30 days and gradually increase to weekly visits. Respondent was also allowed to contact the children by mail.

¶ 9    In a Youth Services Bureau (YSB) service plan dated August 24, 2018, it was reported that the children were placed with a maternal great aunt and uncle and were thriving in that home. They were hosting visits between the children and Lea, but there had been no visits with respondent.

¶ 10    On September 28, 2018, the State filed an amended petition for adjudication for P.R. adding a count that he was neglected because his environment was injurious to his welfare, in that his parents created a substantial risk of harm because he suffered multiple brain hemorrhages while in his parents' care without a reasonable explanation. Also on September 28, 2018, the State filed an amended petition for adjudication for K.R. alleging a substantially similar count, that she was neglected because her sibling suffered multiple brain hemorrhages while in their parents' care.

¶ 11    A service plan dated January 3, 2019, rated respondent unsatisfactory for the goals related to mental health services, parenting classes, and domestic violence, stating that the services were not offered at the jail. He was rated satisfactory for goals related to alcohol and drug abuse, and for keeping in contact with the agency.

¶ 12    On February 1, 2019, the State filed second amended petitions for adjudication for both children adding a count that they were neglected because their environment was injurious to their welfare, in that Lea failed to protect P.R. from injury on January 10, 2018.

¶ 13    A CASA court report filed February 21, 2019, stated that respondent had weekly visits with the children at the jail.

¶ 14    On March 1, 2019, following adjudicatory hearings, the trial court ruled the children were abused and neglected as alleged in the second amended petitions. It found as follows. A DCFS investigator testified that on January 10, 2018, Lea told her that respondent shook P.R. at about 4 a.m. that day. In a separate conversation, respondent apologized to the investigator, admitted that he shook P.R. twice, said that he would never do it again and would accept services, and asserted that his having performed CPR on P.R. should count for something. A detective testified that at 6:30 p.m., respondent admitted that he shook P.R. three times and demonstrated how he did so. Respondent further told him that afterwards, he put P.R. back in his crib and pretended to be asleep when Lea got up to check on P.R., who was still crying. The emergency room doctor testified that the imaging of P.R. showed bleeding on the brain and head swelling, that his injuries were such as would be seen with shaking, and that he could not have caused such injuries to himself. An emergency room nurse testified that the parents told him that P.R. was in a baby bouncer and just started turning blue. A doctor from Lurie Children's Hospital testified that P.R.'s injuries were most likely caused by "abuse head trauma," known as shaken baby syndrome. The parents did not bring P.R. to the hospital until 2:29 p.m., about 10.5 hours after respondent injured him.

¶ 15    The trial court entered permanency orders on March 29, 2019, setting a permanency goal of return home within 12 months and finding that respondent had not made reasonable efforts toward that goal.

¶ 16    A YSB report to the court filed on April 2, 2019, stated that respondent was not engaged in most services because he was incarcerated. He reported attending AA meetings and church services. He had scheduled supervised visitation with the children at the jail. The visits were 30 minutes long and through glass, with no contact. They encouraged K.R. to talk with defendant through the phone during the visit. He acted appropriately with P.R.

¶ 17    The trial court entered dispositional orders on April 12, 2019, finding that respondent was unfit and unable to care for the children. It entered permanency orders on July 12, 2019, finding that the appropriate goal was return home within 12 months. It found that respondent had made reasonable efforts.

¶ 18    A CASA status hearing report to the court filed on October 17, 2019, stated that respondent had been found guilty of aggravated battery of a child under 13 years of age. Respondent had re-engaged in counseling services at the jail after they resumed after having been unavailable for a time, and he had begun taking anger management classes. He stayed in contact with the caseworker on a monthly basis and provided reports for services. He had 30-minute weekly visitation with the children at the jail and interacted appropriately with the children.

¶ 19    An October 21, 2019, order of the court suspended respondent's visitation with the children due to their therapeutic needs. The trial court entered permanency orders on November 22, 2019, keeping the permanency goal of return home within 12 months. It found that respondent had not made reasonable efforts or progress.

¶ 20    On September 11, 2020, the State filed motions to terminate parental rights. For each child, the State alleged that respondent was unfit because: he failed to maintain a reasonable degree of interest, concern, or responsibility for the child's welfare (750 ILCS 50/1(D)(b) (West 2020))

(count I)[1]; (2) he failed to protect the child from conditions within their environment injuries to their welfare (750 ILCS 50/1(D)(g) (West 2020)) (count II); he failed to make reasonable efforts to correct the conditions that were the basis for removing the child in any nine-month period after the adjudication of neglect on March 1, 2019 (750 ILCS 50/1(D)(m)(i) (West 2020)) (count III); and he failed to make reasonable progress towards the return of the child within a nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)) (count IV). For the last count in each motion, the motions alleged nine-month periods of March 1, 2019, to December 1, 2019; April 1, 2019, to January 1, 2020; and May 1, 2019, to February 1, 2020. The motions alleged that it was in the children's best interest that respondent's parental rights be terminated.

¶ 21    The trial court entered a permanency order on September 18, 2020, changing the goal to substitute care pending court determination on termination of parental rights.

¶ 22    On February 5, 2021, Lea signed irrevocable consents for the adoption of P.R. and K.R.

¶ 23    A hearing on the State's motions to terminate parental rights took place on September 10, 2021, via Zoom. Kayla Milakis, the children's caseworker, provided the following testimony, in relevant part. Respondent was asked to engage in services for mental health, substance abuse, parenting, and domestic violence, along with completing his sentence. He was not able to complete mental health and domestic violence services because neither the jail nor the prison he was later transferred to offered the services. For substance abuse services, he was able to engage in AA meetings in jail, but he was not able to in the prison.

---

[1] We include count numbers for the sake of clarity of this disposition. These count numbers do not correspond to the numbering of the allegations in the motions for the termination of respondent's parental rights.

¶ 24    Milakis testified that the children were living with their maternal great aunt and uncle in Sycamore. The children considered the home theirs. They had never shown Milakis any cards, gifts, or letters that respondent had sent them, never asked about him, and never expressed a desire to visit him. Respondent had not provided any financial support. All of the children's needs were being met by their foster parents. Respondent had expressed to Milakis in a letter that he missed the children and wanted to see them, but Milakis wrote back that visitation was not allowed due to the court's no-contact order. Respondent had sent letters to the children through the previous caseworker, but they could not pass them along due to the no-contact order. Milakis could not provide any examples of respondent helping the kids or taking care of them, due to respondent's incarceration. Even if respondent was released that day and engaged in services, Milakis opined that it would not be possible to a reasonable degree of certainty that the children could be returned to him within the next year. The children were no closer to returning to his care than they were on the day the case opened. Respondent had stated that he was not the one who injured P.R.

¶ 25    On cross-examination, Milakis testified that respondent had visitation with the children at the jail, and he was appropriate during the visits. He was patient when K.R. did not want to talk through the phone during the visits. Milakis did not recall why respondent's visits were suspended. Respondent had signed releases and regularly communicated with the agency. Milakis admitted that P.R. was nonverbal and therefore could not express a desire to see respondent. While in jail, respondent participated in AA meetings, completed anger management classes, and attended church. The agency did not look into having service providers come to the jail or prison for respondent. Respondent complied with everything that he had been able to do while incarcerated with respect to his services.

¶ 26    On re-direct examination Milakis testified that respondent did not request a service plan appeal or contest the services that were being asked of him. Also, P.R. was nonverbal due to physical abuse.

¶ 27    In response to questioning by the court, Milakis testified that K.R. would be 16 and P.R. would be 14 in 2031, respondent's projected release date. The court took judicial notice of respondent's felony conviction from his actions towards P.R., and that respondent's projected parole date was in 2028 with a projected discharge date of 2031. The trial court also took judicial notice of various court orders and reports to the court.

¶ 28    The trial court then found as follows. The children came into care based on an incident on January 10, 2018, that resulted in P.R. being transferred to the emergency room by ambulance after full cardiac arrest. He was resuscitated but continued to have respiratory issues. The parents initially said that P.R. was in a bouncy seat while in respondent's care, that respondent walked away for a short time, and that when he came back, P.R. was not breathing. P.R. had an abrasion to his face, and a CT scan showed multiple layers of bleeding on the brain, bilateral subdural hematomas, and subarachnoid hematomas. Respondent later acknowledged having shaken P.R. earlier that morning.

¶ 29    Due to that abuse, P.R. was diagnosed with cerebral palsy and had global development delay. He was monitored by a neurologist and the agency's nurse for a seizure disorder. P.R. was nonverbal at age four as a direct result of respondent's injuries to him. Respondent was found guilty beyond a reasonable doubt of aggravated battery of P.R., and his conviction was affirmed on appeal.[2]

_____

[2]We do not include a citation to the case because it would reveal last names.

¶ 30    Regarding count I, that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare, there was testimony of respondent's efforts to maintain contact with the minors both at times that visitation would occur and after it was suspended. The court suspended the visitation because of the therapeutic concerns of K.R.'s counselor that the visits were causing her trauma, pending K.R. being able to work through the trauma in counseling. Respondent's failure to pursue re-engaging in visitation could be explained in part by K.R. having not yet restarted counseling, so such efforts would not have been successful. His failure to provide financial support was explained by his incarceration. Therefore, the State did not meet its burden of clear and convincing evidence on the first count.

¶ 31    The State had proven count II, that respondent failed to protect minors from conditions within their environment injurious to their welfare. Respondent first reported that P.R. was in a bouncy chair and that respondent did not know what happened. He later acknowledged harming P.R. More recently, he stated in court that Lea caused the injuries. In the end, either respondent caused the injuries himself, which he was convicted of, he failed to intercede if Lea had injured P.R., or there was a complete lack of awareness of how P.R. was hurt while in his parents' care. The injuries P.R. suffered were "grossly disproportionate to any possibility of injury caused from a bouncy chair."

¶ 32    The State had failed to sufficiently prove count III, as the court could not hold it against respondent for failing to make reasonable efforts while incarcerated if the services were not otherwise available to him. The caseworker testified that respondent made efforts to engage in all of the services that he could.

¶ 33    Last, the State had proven count IV, that respondent failed to make reasonable progress toward the return of the minors within all of the nine-month periods specified after the adjudication

of neglect. Although services were not available to respondent while incarcerated, that was a direct result of respondent having injured P.R. He would not be paroled until the children were about 11 and 14 years old. They had been in care since 2018 and could not wait another 10 years to be reunited with respondent. The caseworker testified that respondent was no closer to having the children returned to his care than when they were taken into care, and that even if he were released that day, he would not be able to correct the conditions that brought the children into care within 12 months. Therefore, respondent had failed to demonstrate reasonable progress toward the return of the children.

¶ 34    The trial court proceeded to a best interest hearing, after which it found that it was in the children's best interest for respondent's parental rights to be terminated.

¶ 35    The trial court entered formal written orders regarding the termination of respondent's parental rights on September 15, 2021.

¶ 36    Respondent timely appealed.

¶ 37                                II. ANALYSIS

¶ 38    The termination of parental rights is a two-step process governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). The court must first find by clear and convincing evidence that the parent is unfit under one of the statutory grounds of parental unfitness listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re N.G.*, 2018 IL 121939, ¶ 28. We will not reverse a trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Id.* ¶ 29. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id*. If the trial court determines that the parent is unfit, the trial court's focus shifts from the parent's rights to whether it is in the

child's best interest to terminate parental rights in the second stage of the process, the best interest hearing. *In re S.H.*, 2014 IL App 3d 140500, ¶ 34. In this appeal, respondent challenges the rulings from the fitness hearing but not the best interest hearing.

¶ 39 Respondent first contests the trial court's findings regarding count II that he failed to protect the children from conditions within their environment injuries to their welfare. He argues that if he "[was] believed and he took the fall for Mother, the Court's fallacy in this finding was that [he] should have interceded on behalf of the minor if Mother caused the minor's injuries because it assumes that [he] knew that Mother had shaken the minor at 4:00 a[.]m[.] in the morning or that [he] should have been aware of Mother's actions at that time in the morning." Respondent argues that the finding was entirely speculative. He maintains that when he became aware that P.R. had stopped breathing, he resuscitated him, an ambulance was called, and P.R. was taken to the hospital. Respondent argues that he took actions "to remedy the situation in one [*sic*] that he may not have created." Respondent asserts that there was no evidence that P.R. had been shaken more than once or that the child had otherwise been abused by him. Respondent argues that Lea was never called as a witness to clarify who injured P.R. Respondent acknowledges that the court considered his conviction, but he argues that Lea's testimony "may not have [been] accepted at that trial." Respondent argues that his admission to shaking P.R. could have been to cover for Lea because he thought that she would get custody of the children and that they could resume their family life after he finished his prison sentence.

¶ 40 For K.R. in particular, respondent additionally argues that it is speculative that what happened to P.R. would apply to K.R. based on one incident. Respondent contends that there was no evidence that he had shaken or otherwise abused K.R. He asserts that by all accounts, she was a healthy, thriving child at the time of the incident.

¶ 41   Respondent's argument is not persuasive. A parent may be found unfit under section 1(D)(g) based on evidence of the parent's conduct that led to the child's removal. *In re C.N.*, 199 Ill. 2d 198, 219 (2002). Here, respondent was convicted of the aggravated battery of P.R. by shaking him on the day in question, and this court affirmed respondent's conviction on appeal. Indeed, we allowed respondent's appellate counsel to withdraw on the basis that there was no issue of arguable merit to pursue on appeal. *Id.* The trial court could and did take judicial notice of respondent's conviction and our affirmance of the conviction. The trial court further cited testimony and evidence from the adjudicatory hearing about P.R.'s injuries and defendant's admission to more than one person that he had caused the injuries. The State was not required to call Lea as a witness and relitigate whether defendant was guilty of the crime. There was already clear and convincing evidence that respondent failed to protect minors from conditions within their environment injurious to their welfare, in that defendant's conviction and the affirmance of that conviction was very strong evidence that he injured P.R.

¶ 42   Taken in context, the trial court's comments, that the count would still be satisfied if Lea had shaken P.R., were a means of addressing all of the scenarios that respondent had set forth as the cause of P.R.'s injuries, as opposed to an acceptance of respondent's assertion that he was not responsible. For example, the trial court addressed the scenario of respondent leaving P.R. in a bouncy seat and returning to find him injured, stating that respondent's lack of awareness of how the injury was caused would satisfy the count. However, the trial court later stated that P.R.'s injuries were "grossly disproportionate to any possibility of injury caused from a bouncy chair," showing that it did not believe that such an account was credible. Regardless, we may affirm the trial court's ruling on any basis supported by the record, regardless of the trial court's reasoning (*In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 24), and it was not against the manifest weight of

the evidence to find that the State had sufficiently proven count I given respondent's conviction of P.R.'s abuse.

¶ 43   Respondent's argument that the abuse of P.R. is not relevant to K.R. is without merit. As our supreme court stated:

> "[W]hen deciding a parent's fitness as to a particular child, the court may find relevant evidence of that parent's neglect toward his or her other children and, depending on the ground for unfitness alleged, evidence of the neglect or abuse of the other child or children may be sufficient to support the finding of unfitness as to the particular child. This may be so even when the particular child was born after the occurrences of neglect or abuse toward the other child or children." *In re D.C.*, 209 Ill. 2d 287, 300 (2004).

Given that respondent's abuse of P.R. was so serious that it caused life-long damage to P.R., it was not against the manifest weight of the evidence for the trial court to conclude that respondent was also unfit as to K.R.

¶ 44   Respondent also contests the trial court's ruling that the State had proven count IV, that he failed to make reasonable progress toward the return of the minors within all of the nine-month periods specified after the adjudications of neglect. However, only one statutory ground is necessary to prove that a parent is unfit (see 750 ILCS 50/1(D) (West 2020)), and where " 'parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court.' " *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 43 (quoting *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004)). We may instead affirm the trial court's judgment where the evidence supports a finding of unfitness as to any single count. *Id.* As we have affirmed the trial court's ruling on count II as to both children, we do not address respondent's challenge to the trial court's ruling on count IV.

¶ 45                                    III. CONCLUSION

¶ 46    For the reasons stated, we affirm the judgment of the De Kalb County circuit court.

¶ 47    Affirmed.