NOTICE
Decision filed 11/12/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250517-U

NOS. 5-25-0517, 5-25-0518 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

| | | |
|---|---|---|
| *In re* EMERALD K. and ANTESYAH K., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 24-JA-47, 24-JA-51 |
| | ) | |
| Anthony G., | ) | Honorable |
| | ) | Janet R. Heflin, |
| Respondent-Appellant). | ) | Judge, presiding. |

---

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The judgment of the circuit court terminating Father's parental rights is affirmed where the circuit court's finding that Father was unfit for failure to make reasonable progress and effort towards the goal of the children returning home within the relevant nine-month period is not against the manifest weight of the evidence.

¶ 2    The respondent, Anthony G. (Father), appeals the circuit court of Madison County's June 16, 2025, order finding him unfit as to his minor children, Emerald K. and Antesyah K. On appeal, Father challenges the circuit court's unfitness finding based upon his failure to make reasonable progress towards the return of his children to his custody and his failure to make reasonable effort towards remedying the circumstances that led to his children's removal. For the following reasons, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4     This case began on March 6, 2024, when the State filed juvenile petitions for Emerald K., who was born in late February 2024, and Antesyah K., who was born in late August of 2013, which named Jazmin K.[1] (Mother) as the children's mother and Anthony G. as their father. The petition for Emerald alleged that she was neglected under section 2-3(1) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1) (West 2024)) due to being born exposed to cocaine. The petition for Antesyah alleged that she was neglected due to an injurious environment under section 2-3(1) Juvenile Court Act (*id.*) based on Mother's substance abuse, which impaired her ability to adequately care for Antesyah and led to Antesyah's sibling being born exposed to cocaine. On the same day, Mother and Father stipulated to the allegations contained in the petitions, and the court entered an "Order For Continuance Under Supervision Rules," which allowed the minors to remain in the custody of Mother and Father, subject to certain conditions and while receiving intact services.

¶ 5     Also on March 6, 2024, an initial Department of Children and Family Services (DCFS) family service plan (service plan) was prepared, which included recommendations to address the safety concerns that led to Emerald and Antesyah being removed from Father's care. The steps in the initial service plan required Father to (1) provide safe and stable housing, (2) cooperate with drug screenings, (3) cooperate with DCFS, (4) participate in substance abuse treatment, (5) participate in parenting classes, and (6) participate in a domestic violence assessment.

---

[1]Jazmin K. is not a party to this appeal. In addition to Madison County case No. 24-JA-47 regarding Emerald and Madison County case No. 24-JA-51 regarding Antesyah, Jazmin was named as a respondent in juvenile cases for other minor children in Madison County cases 24-JA-48 (Poet K.), 24-JA-49 (Shadid K.), 24-JA-50 (Empress K.), 24-JA-52 (Aniyah K.), 24-JA-53 (Keirsten K.), and 24-JA-197 (Karishma H.).

¶ 6    On June 18, 2024, the cases were called by the circuit court for review and were continued under the prior rules of supervision. The order noted that Mother and Father were in compliance with prior orders of the circuit court, and there were no safety concerns with the family at this time.

¶ 7    On July 11, 2024, an adjudicatory order was filed finding the minors were neglected due to an environment injurious to their welfare as defined by section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)). The findings were based on the allegations that were previously stipulated to when the March 6, 2024, order for continuance under supervision rules was entered. Both parents signed the order. The court entered a dispositional order finding Father unfit to care for the minors due to a failure to complete the service plan. The minors were made wards of the court, giving DCFS custody and guardianship. Also on July 11, 2024, the State filed a petition to revoke an order for continuance under supervision rules, seeking to discontinue the visitation rights of the parents as "[p]arents have engaged in domestic violence in the presence of the minors."

¶ 8    On October 2, 2024, a dispositional and permanency report was filed. This report stated that Father was unsatisfactory for his progress in his service plan, specifically, in the areas of safe and stable housing, domestic violence perpetrator treatment, substance abuse services, and parenting skills. The report also stated Father "was arrested and detained on August 15, 2024, on 4 felony charges (24-CF-1806): Aggravated Domestic Battery Strangulation, Unlawful Possession of Weapon by a Convicted Felon, Domestic Battery-Bodily Harm to Family Member, Sex Offender—Failure to Register." The report stated that Father was sentenced to five years in the Department of Corrections for "Failure to Report Weekly/No Address/2nd+ Felon Possession/Use Firearm." At the time of the report his projected parole date was February 11, 2027. The report also stated Mother was arrested on August 15, 2024, "for charges affiliated to reasons the children entered DCFS care."

3

¶ 9    On October 7, 2024, the court entered its first permanency order finding the parents had failed to make reasonable efforts and progress towards the return of the minors. It stated the parents were to receive no visitation and that Father had not made reasonable and substantial progress towards bringing the minors back into his care. The goal was return home within 12 months. The order also stated that both parents were currently incarcerated.

¶ 10    On February 3, 2025, the court entered a subsequent permanency order. The permanency goal changed from return home within 12 months to substitute care pending determination of parental rights. The order also found neither parent had made reasonable efforts. On May 1, 2025, a certificate was filed showing that Father had successfully completed the required substance abuse program.

¶ 11    On May 8, 2025, the court entered a subsequent permanency order. The permanency goal remained substitute care pending determination of parental rights, and the court found that neither parent had made reasonable efforts.

¶ 12    On May 13, 2025, the State filed a petition for termination of parental rights and for appointment of guardian with power to consent to adoption. The petition stated that Father was unfit due to: (1) his failure to make reasonable efforts to correct the conditions that were the basis for the removal of the minors during any nine-month period, specifically, August 8, 2024, to May 8, 2025; (2) his failure to make reasonable progress toward the return of the minors during any nine-month period, specifically, August 8, 2024, to May 8, 2025; (3) his failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors; and (4) depravity, as he has been criminally convicted of at least three felonies and at least one of these convictions took place within five years of the filing of the petition seeking termination of parental rights.

4

¶ 13    On June 16, 2025, the circuit court held a hearing to determine Father's fitness and ultimately found him unfit. Erika Wright, the DCFS caseworker assigned to the case., testified regarding Father's fitness. Ms. Wright stated that she was the sole caseworker assigned to the case and that her responsibilities included developing and updating the service plan and preparing court reports. She explained that Father was listed as Emerald's parent; however, the agency had been unable to obtain a birth certificate for Antesyah.

¶ 14    Ms. Wright testified that the minors came into DCFS care on July 9, 2024, after Mother called police to report that Father had locked out three of the seven children. When the State clarified that the incident involved domestic violence, Ms. Wright confirmed that it did. The State then questioned Ms. Wright about the service plan created for Father, covering the period from August 8, 2024, through May 8, 2025. According to Ms. Wright, Father's service tasks included cooperating with DCFS, maintaining safe and stable housing, participating in domestic violence services, completing substance abuse treatment, and attending parenting classes. She further testified that no changes had been made to Father's service plan.

¶ 15    Ms. Wright stated that she communicated with Father primarily through letters and had not received verification from Taylorville Correctional Facility confirming his completion of any service plan tasks. She also confirmed that she had some communication with Father throughout the life of the case. On cross-examination, Ms. Wright testified that while she was aware Father had received the service plan, she had not reviewed the plan with him. Ms. Wright also testified that Taylorville Correctional Facility did not offer a domestic violence program but stated he would still be required to complete the course upon his release from prison.

¶ 16    Father testified at the hearing on his own behalf stating that he did not understand the service plan he received while at the Taylorville Correctional Facility and he was given no

5

explanation from DCFS. Father further testified that he took actions to bring the children back into his care, such as writing to the judge on several occasions, meeting with his case counsel, completing a substance abuse class, completing a portion of his required parenting class, and requesting to be transferred to the Southwestern Correctional Facility that offered more programs required under the service plan.

¶ 17 Following the testimony, the court issued its ruling from the bench. The court found that Father clearly had an interest in his children and was not depraved; however, due to his lack of compliance with the service plan and the length of time it would take for him to achieve compliance, the court found him unfit for failure to make reasonable efforts or reasonable progress.

¶ 18 After a short recess, the best interest of the child hearing was held. Ms. Wright testified as to the current placements of the minors. The minors were placed separately following their removal from the home. Antesyah was placed with a relative, while Emerald was placed with a traditional licensed foster family. Both minors have remained in their respective placements since July 10, 2024. The caseworker testified that Emerald is doing well in her foster placement and is loved by everyone in the home. Antesyah resides in a foster home with her foster mother and her biological sister. She has developed a positive bond with her foster mother and has become noticeably calmer since entering the placement. Ms. Wright further testified that both foster homes are approved and that the minors are integrated into their respective families.

¶ 19 On cross-examination, Ms. Wright testified that the minors participate in sibling visits and that it was a "strong possibility" those visits would continue. She was not aware of the children talking about their father. The court admitted the best interest report into evidence.

¶ 20　Father testified that he wanted additional time to complete his services. Additionally, he said that the warden had submitted a request to transfer him to a facility offering more available programs.

¶ 21　The State did not present additional questions but argued that the children deserved permanency. The State's attorney stated, "Even if Father were to complete all of the services he listed just now, I think it's been made clear that Father would need to complete other services after he was released from prison."

¶ 22　On June 16, 2025, the circuit court entered an order terminating Father's parental rights, finding he failed to make reasonable efforts and reasonable progress in the nine-month period of August 8, 2024, through May 8, 2025. As stated above, the court found that Father has an interest in the children and is not depraved, but due to the need for permanency, it is in the best interest of the children for Father's parental rights to be terminated. Father filed a timely appeal of the June 16, 2025, order.

¶ 23　　　　　　　　　　　　　　II. ANAYLSIS

¶ 24　On appeal, Father urges this court to reverse the circuit court's finding that he is an unfit parent. Father raises one argument on appeal. He argues that the circuit court erred in finding him unfit because the State failed to prove, by clear and convincing evidence, that Father was unfit due to his failure to make reasonable progress and reasonable efforts towards the return of his children in the nine-month period. Father does not challenge the court's best interest finding. In response, the State asserts that the circuit court properly found Father unfit as Father failed to fully engage in the services provided to him and that he had not met the standards of reasonable progress or efforts. We agree with the State. Because Father failed to fully engage with the services provided

7

to him and ultimately failed to complete the service plan in the nine-month period, Father was properly found unfit. See *In re C.N.*, 196 Ill. 2d 181, 215 (2001).

¶ 25    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2024).

¶ 26    The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352.

¶ 27    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re D.T.*, 212 Ill. 2d at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d at 208. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be

decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). In addition, because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 218 (2002).

¶ 28    Section 1(D)(m) of the Adoption Act contains two separate grounds, either of which may uphold a finding of unfitness. Subsection (i) deals with a parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child, and subsection (ii) deals with a parent's failure to make reasonable progress toward the return of the child during any nine-month period following the adjudication of the child as neglected or abused. A parent's failure to substantially fulfill their obligations under a service plan and correct the conditions that brought the child into care is considered failure to make reasonable progress toward the return of the child to the parent. 750 ILCS 50/1(D)(m) (West 2024). Here, the circuit court found Father was unfit based on his failure to make both reasonable progress and reasonable efforts toward the return of Emerald and Antesyah during the nine-month period of August 8, 2024, to May 8, 2025.

¶ 29    Reasonable progress is judged by an objective standard based on the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress exists when the circuit court concludes that it will be able to order the child returned to parental custody in the near future. However, a parent does not have an unlimited amount of time to make reasonable efforts or progress toward the return home of his children. *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 30    Ultimately, the "reasonable progress" standard does not require that a parent complete all required tasks or services during the relevant nine-month period, but rather, at a minimum, the parent must make measurable steps toward the goal of reunification through compliance with court directives, service plans, or both. See *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002).

¶ 31    "Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person." *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The benchmark for reasonable effort is the parent's compliance with the service plans and the court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known and would prevent the court from returning custody of the child to the parent. *Id.* at 1067. Thus, the difference between reasonable progress and reasonable efforts is that reasonable progress is more concerned with the effect the parent's effort has on the ability of the parent to care for the child, rather than on the actual effort itself. See *In re D.F.*, 332 Ill. App. 3d at 125.

¶ 32    Here, the evidence presented at the fitness hearing, that Father completed only the substance abuse course and failed to complete the remaining services required in his plan, supported a finding that Father did not make reasonable progress or reasonable efforts during the nine-month period at issue. Father argues that the circuit court erred in considering his incarceration as a factor for its finding of unfitness and that he was unable to complete his required service plan due to his incarceration. However, reasonable progress is an objective standard that is not to be judged by the subjective situation of the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. While Father's failure to complete his service plan was, in part, due to his incarceration, the

10

court is not to take his circumstances into consideration for his lack of progress. *In re J.L.*, 236 Ill. 2d at 343.

¶ 33　While incarcerated, Father completed the substance abuse class required by his service plan and requested to be transferred to the Southwestern Correctional Facility, where he could complete additional classes unavailable to him at his current facility. Despite these efforts, the best interest report filed on June 3, 2025, noted that Father stopped participating in the parenting services upon his incarceration on August 15, 2024.

¶ 34　Father further argues that he did not understand the service plan that he received and was unable to have it explained to him by the DCFS caseworker. However, Father's subjective understanding of the service plan is not a factor under the objective standard of reasonable progress. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. Service plans are only required to reasonably relate to remedying the situation. Father makes no issue of the relatedness of the service plan. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 23.

¶ 35　As Father correctly points out, however, the standard for measuring reasonable efforts, unlike reasonable progress, is a subjective one and "refers to the amount of effort reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. Nevertheless, even assuming Father's efforts met the subjective test for reasonable efforts, because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d at 218.

¶ 36　We must affirm if we find evidence to support the circuit court's finding that Father failed to make reasonable progress or reasonable efforts toward the return of the children during any nine-month period following the adjudication of neglect (see *id.* at 217). After reviewing the record, we cannot say that an opposite conclusion is clearly apparent. We find the circuit court's

11

determination that Father is unfit because he failed to make reasonable progress and reasonable efforts toward the return of Emerald and Antesyah in the nine-month period alleged is not against the manifest weight of the evidence and is affirmed.

¶ 37 Lastly, we again note that Father does not challenge the circuit court's finding that it was in the children's best interests that his parental rights be terminated, and so that finding is also affirmed. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited).

¶ 38                                  III. CONCLUSION

¶ 39 For the foregoing reasons, the June 16, 2025, judgment of the circuit court of Madison County that terminated Father's parental rights as to Emerald and Antesyah is hereby affirmed.


¶ 40 Affirmed.